# PARIS ADULT THEATRE I et al. *v.* SLATON, DISTRICT ATTORNEY, et al.

No. 71–1051.   Argued October 19, 1972—Decided June 21, 1973

BURGER, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 70. BRENNAN, J., filed a dissenting opinion, in which STEWART and MARSHALL, JJ., joined, *post*, p. 73.

*Robert Eugene Smith* argued the cause for petitioners. With him on the brief were *Mel S. Friedman* and *D. Freeman Hutton*.

*Thomas E. Moran* argued the cause for respondents. With him on the brief was *Joel M. Feldman*.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

Petitioners are two Atlanta, Georgia, movie theaters and their owners and managers, operating in the

---

*\*Charles H. Keating, Jr.,* pro se, *Richard M. Bertsch, James J. Clancy,* and *Albert S. Johnston III* filed a brief for Charles H. Keating, Jr., as *amicus curiae* urging affirmance.

style of "adult" theaters.  On December 28, 1970, respondents, the local state district attorney and the solicitor for the local state trial court, filed civil complaints in that court alleging that petitioners were exhibiting to the public for paid admission two allegedly obscene films, contrary to Georgia Code Ann. § 26–2101.[1] The two films in question, "Magic Mirror" and "It All Comes Out in the End," depict sexual conduct char-

---

[1] This is a civil proceeding.  Georgia Code Ann. § 26–2101 defines a criminal offense, but the exhibition of materials found to be "obscene" as defined by that statute may be enjoined in a civil proceeding under Georgia case law. *1024 Peachtree Corp.* v. *Slaton,* 228 Ga. 102, 184 S. E. 2d 144 (1971); *Walter* v. *Slaton,* 227 Ga. 676, 182 S. E. 2d 464 (1971); *Evans Theatre Corp.* v. *Slaton,* 227 Ga. 377, 180 S. E. 2d 712 (1971). See *infra,* at 54.  Georgia Code Ann. § 26–2101 reads in relevant part:

"Distributing obscene materials.

"(a) A person commits the offense of distributing obscene materials when he sells, lends, rents, leases, gives, advertises, publishes, exhibits or otherwise disseminates to any person any obscene material of any description, knowing the obscene nature thereof, or who offers to do so, or who possesses such material with the intent so to do . . . .

"(b) Material is obscene if considered as a whole, applying community standards, its predominant appeal is to prurient interest, that is, a shameful or morbid interest in nudity, sex or excretion, and utterly without redeeming social value and if, in addition, it goes substantially beyond customary limits of candor in describing or representing such matters. . . .

.          .          .          .          .

"(d) A person convicted of distributing obscene material shall for the first offense be punished as for a misdemeanor, and for any subsequent offense shall be punished by imprisonment for not less than one nor more than five years, or by a fine not to exceed $5,000, or both."

The constitutionality of Georgia Code Ann. § 26–2101 was upheld against First Amendment and due process challenges in *Gable* v. *Jenkins,* 309 F. Supp. 998 (ND Ga. 1969), aff'd *per curiam,* 397 U. S. 592 (1970).

acterized by the Georgia Supreme Court as "hard core pornography" leaving "little to the imagination."

Respondents' complaints, made on behalf of the State of Georgia, demanded that the two films be declared obscene and that petitioners be enjoined from exhibiting the films. The exhibition of the films was not enjoined, but a temporary injunction was granted *ex parte* by the local trial court, restraining petitioners from destroying the films or removing them from the jurisdiction. Petitioners were further ordered to have one print each of the films in court on January 13, 1971, together with the proper viewing equipment.

On January 13, 1971, 15 days after the proceedings began, the films were produced by petitioners at a jury-waived trial. Certain photographs, also produced at trial, were stipulated to portray the single entrance to both Paris Adult Theatre I and Paris Adult Theatre II as it appeared at the time of the complaints. These photographs show a conventional, inoffensive theater entrance, without any pictures, but with signs indicating that the theaters exhibit "Atlanta's Finest Mature Feature Films." On the door itself is a sign saying: "Adult Theatre—You must be 21 and able to prove it. If viewing the nude body offends you, Please Do Not Enter."

The two films were exhibited to the trial court. The only other state evidence was testimony by criminal investigators that they had paid admission to see the films and that nothing on the outside of the theater indicated the full nature of what was shown. In particular, nothing indicated that the films depicted—as they did—scenes of simulated fellatio, cunnilingus, and group sex intercourse. There was no evidence presented that minors had ever entered the theaters. Nor was there evidence presented that petitioners had a systematic policy of barring minors, apart from posting signs at the entrance. On April 12, 1971, the trial judge dismissed

respondents' complaints. He assumed "that obscenity is established," but stated:

"It appears to the Court that the display of these films in a commercial theatre, when surrounded by requisite notice to the public of their nature and by reasonable protection against the exposure of these films to minors, is constitutionally permissible."

On appeal, the Georgia Supreme Court unanimously reversed. It assumed that the adult theaters in question barred minors and gave a full warning to the general public of the nature of the films shown, but held that the films were without protection under the First Amendment. Citing the opinion of this Court in *United States* v. *Reidel,* 402 U. S. 351 (1971), the Georgia court stated that "the sale and delivery of obscene material to willing adults is not protected under the first amendment." The Georgia court also held *Stanley* v. *Georgia,* 394 U. S. 557 (1969), to be inapposite since it did not deal with "the commercial distribution of pornography, but with the right of Stanley to possess, in the privacy of his home, pornographic films." 228 Ga. 343, 345, 185 S. E. 2d 768, 769 (1971). After viewing the films, the Georgia Supreme Court held that their exhibition should have been enjoined, stating:

"The films in this case leave little to the imagination. It is plain what they purport to depict, that is, conduct of the most salacious character. We hold that these films are also hard core pornography, and the showing of such films should have been enjoined since their exhibition is not protected by the first amendment." *Id.,* at 347, 185 S. E. 2d, at 770.

I

It should be clear from the outset that we do not undertake to tell the States what they must do, but

rather to define the area in which they may chart their own course in dealing with obscene material. This Court has consistently held that obscene material is not protected by the First Amendment as a limitation on the state police power by virtue of the Fourteenth Amendment. *Miller* v. *California, ante,* at 23–25; *Kois* v. *Wisconsin,* 408 U. S. 229, 230 (1972); *United States* v. *Reidel, supra,* at 354; *Roth* v. *United States,* 354 U. S. 476, 485 (1957).

Georgia case law permits a civil injunction of the exhibition of obscene materials. See *1024 Peachtree Corp.* v. *Slaton,* 228 Ga. 102, 184 S. E. 2d 144 (1971); *Walter* v. *Slaton,* 227 Ga. 676, 182 S. E. 2d 464 (1971); *Evans Theatre Corp.* v. *Slaton,* 227 Ga. 377, 180 S. E. 2d 712 (1971). While this procedure is civil in nature, and does not directly involve the state criminal statute proscribing exhibition of obscene material,[2] the Georgia case law permitting civil injunction does adopt the definition of "obscene materials" used by the criminal statute.[3] Today, in *Miller* v. *California, supra,* we have

---

[2] See Georgia Code Ann. § 26–2101, set out *supra,* at 51 n. 1.

[3] In *Walter* v. *Slaton,* 227 Ga. 676, 182 S. E. 2d 464 (1971), the Georgia Supreme Court described the cases before it as follows: "Each case was commenced as a civil action by the District Attorney of the Superior Court of Fulton County jointly with the Solicitor of the Criminal Court of Fulton County. In each case the plaintiffs alleged that the defendants named therein were conducting a business of exhibiting motion picture films to members of the public; that they were in control and possession of the described motion picture film which they were exhibiting to the public on a fee basis; that said film 'constitutes a flagrant violation of Ga. Code § 26–2101 in that the sole and dominant theme of the motion picture film . . . considered as a whole, and applying contemporary standards, appeals to the prurient interest in sex and nudity, and that said motion picture film is utterly and absolutely without any redeeming social value whatsoever and transgresses beyond the customary limits of candor in describing and discussing sexual matters.' " *Id.,* at 676–677, 182 S. E. 2d, at 465.

sought to clarify the constitutional definition of obscene material subject to regulation by the States, and we vacate and remand this case for reconsideration in light of *Miller*.

This is not to be read as disapproval of the Georgia civil procedure employed in this case, assuming the use of a constitutionally acceptable standard for determining what is unprotected by the First Amendment. On the contrary, such a procedure provides an exhibitor or purveyor of materials the best possible notice, prior to any criminal indictments, as to whether the materials are unprotected by the First Amendment and subject to state regulation.[4] See *Kingsley Books, Inc.* v. *Brown*, 354 U. S. 436, 441–444 (1957). Here, Georgia imposed no restraint on the exhibition of the films involved in this case until after a full adversary proceeding and a final judicial determination by the Georgia Supreme Court that the materials were constitutionally unprotected.[5] Thus the standards of *Blount* v. *Rizzi*, 400 U. S. 410, 417 (1971); *Teitel Film Corp.* v. *Cusack*, 390 U. S. 139, 141–142 (1968); *Freedman* v. *Maryland*, 380 U. S. 51, 58–59 (1965), and *Kingsley Books, Inc.* v. *Brown, supra,* at 443–445, were met. Cf. *United States* v. *Thirty-seven Photographs*, 402 U. S. 363, 367–369 (1971) (opinion of WHITE, J.).

---

[4] This procedure would have even more merit if the exhibitor or purveyor could also test the issue of obscenity in a similar civil action, prior to any exposure to criminal penalty. We are not here presented with the problem of whether a holding that materials were not obscene could be circumvented in a later proceeding by evidence of pandering. See *Memoirs* v. *Massachusetts*, 383 U. S. 413, 458 n. 3 (1966) (Harlan, J., dissenting); *Ginzburg* v. *United States,* 383 U. S. 463, 496 (1966) (Harlan, J., dissenting).

[5] At the specific request of petitioners' counsel, the copies of the films produced for the trial court were placed in the "administrative custody" of that court pending the outcome of this litigation.

Nor was it error to fail to require "expert" affirmative evidence that the materials were obscene when the materials themselves were actually placed in evidence. *United States* v. *Groner,* 479 F. 2d 577, 579–586 (CA5 1973); *id.,* at 586–588 (Ainsworth, J., concurring); *id.,* at 588–589 (Clark, J., concurring); *United States* v. *Wild,* 422 F. 2d 34, 35–36 (CA2 1969), cert. denied, 402 U. S. 986 (1971); *Kahm* v. *United States,* 300 F. 2d 78, 84 (CA5), cert. denied, 369 U. S. 859 (1962); *State* v. *Amato,* 49 Wis. 2d 638, 645, 183 N. W. 2d 29, 32 (1971), cert. denied *sub nom. Amato* v. *Wisconsin,* 404 U. S. 1063 (1972). See *Smith* v. *California,* 361 U. S. 147, 172 (1959) (Harlan, J., concurring and dissenting); *United States* v. *Brown,* 328 F. Supp. 196, 199 (ED Va. 1971). The films, obviously, are the best evidence of what they represent.[6] "In the cases in which this Court has decided obscenity questions since *Roth,* it has regarded the materials as sufficient in themselves for the determination of the question." *Ginzburg* v. *United States,* 383 U. S. 463, 465 (1966).

---

[6] This is not a subject that lends itself to the traditional use of expert testimony. Such testimony is usually admitted for the purpose of explaining to lay jurors what they otherwise could not understand. Cf. 2 J. Wigmore, Evidence §§ 556, 559 (3d ed. 1940). No such assistance is needed by jurors in obscenity cases; indeed the "expert witness" practices employed in these cases have often made a mockery out of the otherwise sound concept of expert testimony. See *United States* v. *Groner,* 479 F. 2d 577, 585–586 (CA5 1973); *id.,* at 587–588 (Ainsworth, J., concurring). "Simply stated, hard core pornography . . . can and does speak for itself." *United States* v. *Wild,* 422 F. 2d 34, 36 (CA2 1970), cert. denied, 402 U. S. 986 (1971). We reserve judgment, however, on the extreme case, not presented here, where contested materials are directed at such a bizarre deviant group that the experience of the trier of fact would be plainly inadequate to judge whether the material appeals to the prurient interest. See *Mishkin* v. *New York,* 383 U. S. 502, 508–510 (1966); *United States* v. *Klaw,* 350 F. 2d 155, 167–168 (CA2 1965).

## II

We categorically disapprove the theory, apparently adopted by the trial judge, that obscene, pornographic films acquire constitutional immunity from state regulation simply because they are exhibited for consenting adults only. This holding was properly rejected by the Georgia Supreme Court. Although we have often pointedly recognized the high importance of the state interest in regulating the exposure of obscene materials to juveniles and unconsenting adults, see *Miller* v. *California, ante,* at 18–20; *Stanley* v. *Georgia,* 394 U. S., at 567; *Redrup* v. *New York,* 386 U. S. 767, 769 (1967), this Court has never declared these to be the only legitimate state interests permitting regulation of obscene material. The States have a long-recognized legitimate interest in regulating the use of obscene material in local commerce and in all places of public accommodation, as long as these regulations do not run afoul of specific constitutional prohibitions. See *United States* v. *Thirty-seven Photographs, supra,* at 376–377 (opinion of WHITE, J.); *United States* v. *Reidel,* 402 U. S., at 354–356. Cf. *United States* v. *Thirty-seven Photographs, supra,* at 378 (STEWART, J., concurring). "In an unbroken series of cases extending over a long stretch of this Court's history, it has been accepted as a postulate that 'the primary requirements of decency may be enforced against obscene publications.' [*Near* v. *Minnesota,* 283 U. S. 697, 716 (1931)]." *Kingsley Books, Inc.* v. *Brown, supra,* at 440.

In particular, we hold that there are legitimate state interests at stake in stemming the tide of commercialized obscenity, even assuming it is feasible to enforce effective safeguards against exposure to juveniles and to pass-

ersby.[7]  Rights and interests "other than those of the advocates are involved." *Breard* v. *Alexandria,* 341 U. S. 622, 642 (1951).  These include the interest of the public in the quality of life and the total community environment, the tone of commerce in the great city centers, and, possibly, the public safety itself.  The Hill-Link Minority Report of the Commission on Obscenity and Pornography indicates that there is at least an arguable correlation between obscene material and crime.[8]  Quite

---

[7] It is conceivable that an "adult" theater can—if it really insists— prevent the exposure of its obscene wares to juveniles. An "adult" bookstore, dealing in obscene books, magazines, and pictures, cannot realistically make this claim. The Hill-Link Minority Report of the Commission on Obscenity and Pornography emphasizes evidence (the Abelson National Survey of Youth and Adults) that, although most pornography may be bought by elders, "the heavy users and most highly exposed people to pornography are adolescent females (among women) and adolescent and young adult males (among men)." The Report of the Commission on Obscenity and Pornography 401 (1970). The legitimate interest in preventing exposure of juveniles to obscene material cannot be fully served by simply barring juveniles from the immediate physical premises of "adult" bookstores, when there is a flourishing "outside business" in these materials.

[8] The Report of the Commission on Obscenity and Pornography 390–412 (1970). For a discussion of earlier studies indicating "a division of thought [among behavioral scientists] on the correlation between obscenity and socially deleterious behavior," *Memoirs* v. *Massachusetts, supra,* at 451, and references to expert opinions that obscene material may induce crime and antisocial conduct, see *id.,* at 451–453 (Clark, J., dissenting). Mr. Justice Clark emphasized:

"While erotic stimulation caused by pornography may be legally insignificant in itself, there are medical experts who believe that such stimulation frequently manifests itself in criminal sexual behavior or other antisocial conduct. For example, Dr. George W. Henry of Cornell University has expressed the opinion that obscenity, with its exaggerated and morbid emphasis on sex, particularly abnormal and perverted practices, and its unrealistic pres-

apart from sex crimes, however, there remains one problem of large proportions aptly described by Professor Bickel:

> "It concerns the tone of the society, the mode, or to use terms that have perhaps greater currency, the style and quality of life, now and in the future. A man may be entitled to read an obscene book in his room, or expose himself indecently there . . . . We should protect his privacy. But if he demands a right to obtain the books and pictures he wants in the market, and to foregather in public places—discreet, if you will, but accessible to all—with others who share his tastes, *then to grant him his right is to affect the world about the rest of us, and to impinge on other privacies.* Even supposing that each of us can, if he wishes, effectively avert the eye and stop the ear (which, in truth, we cannot), what is commonly read and seen and heard and done intrudes upon us all, want it or not." 22 The Public Interest 25–26 (Winter 1971).[9] (Emphasis added.)

As Mr. Chief Justice Warren stated, there is a "right of the Nation and of the States to maintain a decent soci-

---

entation of sexual behavior and attitudes, may induce antisocial conduct by the average person. A number of sociologists think that this material may have adverse effects upon individual mental health, with potentially disruptive consequences for the community.

.    .    .    .    .

"Congress and the legislatures of every State have enacted measures to restrict the distribution of erotic and pornographic material, justifying these controls by reference to evidence that antisocial behavior may result in part from reading obscenity." *Id.*, at 452–453 (footnotes omitted).

[9] See also Berns, Pornography vs. Democracy: The Case for Censorship, in 22 The Public Interest 3 (Winter 1971); van den Haag, in Censorship: For & Against 156–157 (H. Hart ed. 1971).

ety . . . ," *Jacobellis* v. *Ohio,* 378 U. S. 184, 199 (1964) (dissenting opinion).[10] See *Memoirs* v. *Massachusetts,* 383 U. S. 413, 457 (1966) (Harlan, J., dissenting); *Beauharnais* v. *Illinois,* 343 U. S. 250, 256–257 (1952); *Kovacs* v. *Cooper,* 336 U. S. 77, 86–88 (1949).

But, it is argued, there are no scientific data which conclusively demonstrate that exposure to obscene material adversely affects men and women or their society. It is urged on behalf of the petitioners that, absent such a demonstration, any kind of state regulation is "impermissible." We reject this argument. It is not for us to resolve empirical uncertainties underlying state legislation, save in the exceptional case where that legislation plainly impinges upon rights protected by the Constitution itself.[11] MR. JUSTICE BRENNAN, speaking for the Court in *Ginsberg* v. *New York,* 390 U. S. 629, 642–643 (1968), said: "We do not demand of legislatures 'scientifically certain criteria of legislation.' *Noble State Bank* v. *Haskell,* 219 U. S. 104, 110." Although there is no conclusive proof of a connection between antisocial behavior

---

[10] "In this and other cases in this area of the law, which are coming to us in ever-increasing numbers, we are faced with the resolution of rights basic both to individuals and to society as a whole. Specifically, we are called upon to reconcile the right of the Nation and of the States to maintain a decent society and, on the other hand, the right of individuals to express themselves freely in accordance with the guarantees of the First and Fourteenth Amendments." *Jacobellis* v. *Ohio, supra,* at 199 (Warren, C. J., dissenting).

[11] Mr. Justice Holmes stated in another context, that:

"[T]he proper course is to recognize that a state legislature can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the United States or of the State, and that Courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular Court may happen to entertain." *Tyson & Brother* v. *Banton,* 273 U. S. 418, 446 (1927) (dissenting opinion joined by Brandeis, J.).

and obscene material, the legislature of Georgia could quite reasonably determine that such a connection does or might exist. In deciding *Roth,* this Court implicitly accepted that a legislature could legitimately act on such a conclusion to protect *"the social interest in order and morality."* *Roth* v. *United States,* 354 U. S., at 485, quoting *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572 (1942) (emphasis added in *Roth*).[12]

From the beginning of civilized societies, legislators and judges have acted on various unprovable assumptions. Such assumptions underlie much lawful state regulation of commercial and business affairs. See *Ferguson* v. *Skrupa,* 372 U. S. 726, 730 (1963); *Breard* v. *Alexandria,* 341 U. S., at 632–633, 641–645; *Lincoln Federal Labor Union* v. *Northwestern Iron & Metal Co.,* 335 U. S. 525, 536–537 (1949). The same is true of the federal securities and antitrust laws and a host of federal regulations. See *SEC* v. *Capital Gains Research Bureau, Inc.,* 375 U. S. 180, 186–195 (1963); *American Power & Light Co.* v. *SEC,* 329 U. S. 90, 99–103 (1946); *North American Co.* v. *SEC,* 327 U. S. 686, 705–707 (1946), and cases cited. See also *Brooks* v. *United States,* 267 U. S. 432, 436–437 (1925), and *Hoke* v. *United States,* 227 U. S. 308, 322 (1913). On the basis of these assumptions both Congress and state legislatures have, for example, drastically restricted associational rights by adopting antitrust laws, and have strictly regulated public expression by issuers of and dealers in securities, profit sharing "coupons," and "trading stamps,"

---

[12] *"It has been well observed that such* [lewd and obscene] *utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."* *Roth* v. *United States,* 354 U. S. 476, 485 (1957), quoting *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572 (1942) (emphasis added in *Roth*).

commanding what they must and must not publish and announce. See *Sugar Institute, Inc.* v. *United States,* 297 U. S. 553, 597–602 (1936); *Merrick* v. *N. W. Halsey & Co.,* 242 U. S. 568, 584–589 (1917); *Caldwell* v. *Sioux Falls Stock Yards Co.,* 242 U. S. 559, 567–568 (1917); *Hall* v. *Geiger-Jones Co.,* 242 U. S. 539, 548–552 (1917); *Tanner* v. *Little,* 240 U. S. 369, 383–386 (1916); *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342, 363–368 (1916). Understandably those who entertain an absolutist view of the First Amendment find it uncomfortable to explain why rights of association, speech, and press should be severely restrained in the marketplace of goods and money, but not in the marketplace of pornography.

Likewise, when legislatures and administrators act to protect the physical environment from pollution and to preserve our resources of forests, streams, and parks, they must act on such imponderables as the impact of a new highway near or through an existing park or wilderness area. See *Citizens to Preserve Overton Park* v. *Volpe,* 401 U. S. 402, 417–420 (1971). Thus, § 18 (a) of the Federal-Aid Highway Act of 1968, 23 U. S. C. § 138, and the Department of Transportation Act of 1966, as amended, 82 Stat. 824, 49 U. S. C. § 1653 (f), have been described by Mr. Justice Black as "a solemn determination of the highest law-making body of this Nation that the beauty and health-giving facilities of our parks are not to be taken away for public roads without hearings, factfindings, and policy determinations under the supervision of a Cabinet officer . . . ." *Citizens to Preserve Overton Park, supra,* at 421 (separate opinion joined by BRENNAN, J.). The fact that a congressional directive reflects unprovable assumptions about what is good for the people, including imponderable aesthetic assumptions, is not a sufficient reason to find that statute unconstitutional.

If we accept the unprovable assumption that a complete education requires the reading of certain books, see *Board of Education* v. *Allen,* 392 U. S. 236, 245 (1968), and *Johnson* v. *New York State Education Dept.,* 449 F. 2d 871, 882–883 (CA2 1971) (dissenting opinion), vacated and remanded to consider mootness, 409 U. S. 75 (1972), *id.,* at 76–77 (MARSHALL, J., concurring), and the well nigh universal belief that good books, plays, and art lift the spirit, improve the mind, enrich the human personality, and develop character, can we then say that a state legislature may not act on the corollary assumption that commerce in obscene books, or public exhibitions focused on obscene conduct, have a tendency to exert a corrupting and debasing impact leading to antisocial behavior? "Many of these effects may be intangible and indistinct, but they are nonetheless real." *American Power & Light Co.* v. *SEC, supra,* at 103. Mr. Justice Cardozo said that all laws in Western civilization are "guided by a robust common sense . . . ." *Steward Machine Co.* v. *Davis,* 301 U. S. 548, 590 (1937). The sum of experience, including that of the past two decades, affords an ample basis for legislatures to conclude that a sensitive, key relationship of human existence, central to family life, community welfare, and the development of human personality, can be debased and distorted by crass commercial exploitation of sex. Nothing in the Constitution prohibits a State from reaching such a conclusion and acting on it legislatively simply because there is no conclusive evidence or empirical data.

It is argued that individual "free will" must govern, even in activities beyond the protection of the First Amendment and other constitutional guarantees of privacy, and that government cannot legitimately impede an individual's desire to see or acquire obscene plays, movies, and books. We do indeed base our society on

certain assumptions that people have the capacity for free choice. Most exercises of individual free choice—those in politics, religion, and expression of ideas—are explicitly protected by the Constitution. Totally unlimited play for free will, however, is not allowed in our or any other society. We have just noted, for example, that neither the First Amendment nor "free will" precludes States from having "blue sky" laws to regulate what sellers of securities may write or publish about their wares. See *supra*, at 61–62. Such laws are to protect the weak, the uninformed, the unsuspecting, and the gullible from the exercise of their own volition. Nor do modern societies leave disposal of garbage and sewage up to the individual "free will," but impose regulation to protect both public health and the appearance of public places. States are told by some that they must await a "laissez-faire" market solution to the obscenity-pornography problem, paradoxically "by people who have never otherwise had a kind word to say for laissez-faire," particularly in solving urban, commercial, and environmental pollution problems. See I. Kristol, On the Democratic Idea in America 37 (1972).

The States, of course, may follow such a "laissez-faire" policy and drop all controls on commercialized obscenity, if that is what they prefer, just as they can ignore consumer protection in the marketplace, but nothing in the Constitution *compels* the States to do so with regard to matters falling within state jurisdiction. See *United States* v. *Reidel,* 402 U. S., at 357; *Memoirs* v. *Massachusetts,* 383 U. S., at 462 (WHITE, J., dissenting). "We do not sit as a super-legislature to determine the wisdom, need, and propriety of laws that touch economic problems, business affairs, or social conditions." *Griswold* v. *Connecticut,* 381 U. S. 479, 482 (1965). See *Ferguson* v. *Skrupa,* 372 U. S., at 731; *Day-Brite Lighting, Inc.* v. *Missouri,* 342 U. S. 421, 423 (1952).

It is asserted, however, that standards for evaluating state commercial regulations are inapposite in the present context, as state regulation of access by consenting adults to obscene material violates the constitutionally protected right to privacy enjoyed by petitioners' customers. Even assuming that petitioners have vicarious standing to assert potential customers' rights, it is unavailing to compare a theater open to the public for a fee, with the private home of *Stanley* v. *Georgia,* 394 U. S., at 568, and the marital bedroom of *Griswold* v. *Connecticut, supra,* at 485–486. This Court, has, on numerous occasions, refused to hold that commercial ventures such as a motion-picture house are "private" for the purpose of civil rights litigation and civil rights statutes. See *Sullivan* v. *Little Hunting Park, Inc.,* 396 U. S. 229, 236 (1969); *Daniel* v. *Paul,* 395 U. S. 298, 305–308 (1969); *Blow* v. *North Carolina,* 379 U. S. 684, 685–686 (1965); *Hamm* v. *Rock Hill,* 379 U. S. 306, 307–308 (1964); *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241, 247, 260–261 (1964). The Civil Rights Act of 1964 specifically defines motion-picture houses and theaters as places of "public accommodation" covered by the Act as operations affecting commerce. 78 Stat. 243, 42 U. S. C. §§ 2000a (b)(3), (c).

Our prior decisions recognizing a right to privacy guaranteed by the Fourteenth Amendment included "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty.' *Palko* v. *Connecticut,* 302 U. S. 319, 325 (1937)." *Roe* v. *Wade,* 410 U. S. 113, 152 (1973). This privacy right encompasses and protects the personal intimacies of the home, the family, marriage, motherhood, procreation, and child rearing. Cf. *Eisenstadt* v. *Baird,* 405 U. S. 438, 453–454 (1972); *id.,* at 460, 463–465 (WHITE, J., concurring); *Stanley* v. *Georgia, supra,* at 568; *Loving* v. *Virginia,* 388

U. S. 1, 12 (1967); *Griswold* v. *Connecticut, supra,* at 486; *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944); *Skinner* v. *Oklahoma,* 316 U. S. 535, 541 (1942); *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535 (1925); *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923). Nothing, however, in this Court's decisions intimates that there is any "fundamental" privacy right "implicit in the concept of ordered liberty" to watch obscene movies in places of public accommodation.

If obscene material unprotected by the First Amendment in itself carried with it a "penumbra" of constitutionally protected privacy, this Court would not have found it necessary to decide *Stanley* on the narrow basis of the "privacy of the home," which was hardly more than a reaffirmation that "a man's home is his castle." Cf. *Stanley* v. *Georgia, supra,* at 564.[13] Moreover, we have declined to equate the privacy of the home relied on in *Stanley* with a "zone" of "privacy" that follows a distributor or a consumer of obscene materials wherever he goes. See *United States* v. *Orito, post,* at 141–143; *United States* v. *12 200-ft. Reels of Film, post,* at 126–129; *United States* v. *Thirty-seven Photographs,* 402 U. S., at 376–377 (opinion of WHITE, J.); *United States* v. *Reidel, supra,* at 355. The idea of a "privacy" right and a place of public accommodation are, in this context,

---

[13] The protection afforded by *Stanley* v. *Georgia,* 394 U. S. 557 (1969), is restricted to a place, the home. In contrast, the constitutionally protected privacy of family, marriage, motherhood, procreation, and child rearing is not just concerned with a particular place, but with a protected intimate relationship. Such protected privacy extends to the doctor's office, the hospital, the hotel room, or as otherwise required to safeguard the right to intimacy involved. Cf. *Roe* v. *Wade,* 410 U. S. 113, 152–154 (1973); *Griswold* v. *Connecticut,* 381 U. S. 479, 485–486 (1965). Obviously, there is no necessary or legitimate expectation of privacy which would extend to marital intercourse on a street corner or a theater stage.

mutually exclusive. Conduct or depictions of conduct that the state police power can prohibit on a public street do not become automatically protected by the Constitution merely because the conduct is moved to a bar or a "live" theater stage, any more than a "live" performance of a man and woman locked in a sexual embrace at high noon in Times Square is protected by the Constitution because they simultaneously engage in a valid political dialogue.

It is also argued that the State has no legitimate interest in "control [of] the moral content of a person's thoughts," *Stanley* v. *Georgia, supra,* at 565, and we need not quarrel with this. But we reject the claim that the State of Georgia is here attempting to control the minds or thoughts of those who patronize theaters. Preventing unlimited display or distribution of obscene material, which by definition lacks any serious literary, artistic, political, or scientific value as communication, *Miller* v. *California, ante,* at 24, 34, is distinct from a control of reason and the intellect. Cf. *Kois* v. *Wisconsin,* 408 U. S. 229 (1972); *Roth* v. *United States, supra,* at 485–487; *Thornhill* v. *Alabama,* 310 U. S. 88, 101–102 (1940); Finnis, "Reason and Passion": The Constitutional Dialectic of Free Speech and Obscenity, 116 U. Pa. L. Rev. 222, 229–230, 241–243 (1967). Where communication of ideas, protected by the First Amendment, is not involved, or the particular privacy of the home protected by *Stanley,* or any of the other "areas or zones" of constitutionally protected privacy, the mere fact that, as a consequence, some human "utterances" or "thoughts" may be incidentally affected does not bar the State from acting to protect legitimate state interests. Cf. *Roth* v. *United States, supra,* at 483, 485–487; *Beauharnais* v. *Illinois,* 343 U. S., at 256–257. The fantasies of a drug addict are his own and beyond the reach of government, but government regulation of drug sales is not

prohibited by the Constitution. Cf. *United States* v. *Reidel, supra,* at 359–360 (Harlan, J., concurring).

Finally, petitioners argue that conduct which directly involves "consenting adults" only has, for that sole reason, a special claim to constitutional protection. Our Constitution establishes a broad range of conditions on the exercise of power by the States, but for us to say that our Constitution incorporates the proposition that conduct involving consenting adults only is always beyond state regulation,[14] is a step we are unable to take.[15] Commercial exploitation of depictions, descriptions, or exhibitions of obscene conduct on commercial premises open to the adult public falls within a State's broad power to regulate commerce and protect the public

---

[14] Cf. J. Mill, On Liberty 13 (1955 ed.):

[15] The state statute books are replete with constitutionally unchallenged laws against prostitution, suicide, voluntary self-mutilation, brutalizing "bare fist" prize fights, and duels, although these crimes may only directly involve "consenting adults." Statutes making bigamy a crime surely cut into an individual's freedom to associate, but few today seriously claim such statutes violate the First Amendment or any other constitutional provision. See *Davis* v. *Beason,* 133 U. S. 333, 344–345 (1890). Consider also the language of this Court in *McLaughlin* v. *Florida,* 379 U. S. 184, 196 (1964), as to adultery; *Southern Surety Co.* v. *Oklahoma,* 241 U. S. 582, 586 (1916), as to fornication; *Hoke* v. *United States,* 227 U. S. 308, 320–322 (1913), and *Caminetti* v. *United States,* 242 U. S. 470, 484–487, 491–492 (1917), as to "white slavery"; *Murphy* v. *California,* 225 U. S. 623, 629 (1912), as to billiard halls; and the *Lottery Case,* 188 U. S. 321, 355–356 (1903), as to gambling. See also the summary of state statutes prohibiting bearbaiting, cockfighting, and other brutalizing animal "sports," in Stevens, Fighting and Baiting, in Animals and Their Legal Rights 112–127 (Leavitt ed. 1970). As Professor Irving Kristol has observed: "Bearbaiting and cockfighting are prohibited only in part out of compassion for the suffering animals; the main reason they were abolished was because it was felt that they debased and brutalized the citizenry who flocked to witness such spectacles." On the Democratic Idea in America 33 (1972).

environment. The issue in this context goes beyond whether someone, or even the majority, considers the conduct depicted as "wrong" or "sinful." The States have the power to make a morally neutral judgment that public exhibition of obscene material, or commerce in such material, has a tendency to injure the community as a whole, to endanger the public safety, or to jeopardize, in Mr. Chief Justice Warren's words, the States' "right . . . to maintain a decent society." *Jacobellis* v. *Ohio,* 378 U. S., at 199 (dissenting opinion).

To summarize, we have today reaffirmed the basic holding of *Roth* v. *United States, supra,* that obscene material has no protection under the First Amendment. See *Miller* v. *California, supra,* and *Kaplan* v. *California, post,* p. 115. We have directed our holdings, not at thoughts or speech, but at depiction and description of specifically defined sexual conduct that States may regulate within limits designed to prevent infringement of First Amendment rights. We have also reaffirmed the holdings of *United States* v. *Reidel, supra,* and *United States* v. *Thirty-seven Photographs, supra,* that commerce in obscene material is unprotected by any constitutional doctrine of privacy. *United States* v. *Orito, post,* at 141–143; *United States* v. *12 200-ft. Reels of Film, post,* at 126–129. In this case we hold that the States have a legitimate interest in regulating commerce in obscene material and in regulating exhibition of obscene material in places of public accommodation, including so-called "adult" theaters from which minors are excluded. In light of these holdings, nothing precludes the State of Georgia from the regulation of the allegedly obscene material exhibited in Paris Adult Theatre I or II, provided that the applicable Georgia law, as written or authoritatively interpreted by the Georgia courts, meets the First Amendment standards set forth in *Miller* v. *California, ante,* at 23–25. The

judgment is vacated and the case remanded to the Georgia Supreme Court for further proceedings not inconsistent with this opinion and *Miller* v. *California, supra.* See *United States* v. *12 200-ft. Reels of Film, post,* at 130 n. 7.

*Vacated and remanded.*

MR. JUSTICE DOUGLAS, dissenting.

My Brother BRENNAN is to be commended for seeking a new path through the thicket which the Court entered when it undertook to sustain the constitutionality of obscenity laws and to place limits on their application. I have expressed on numerous occasions my disagreement with the basic decision that held that "obscenity" was not protected by the First Amendment. I disagreed also with the definitions that evolved. Art and literature reflect tastes; and tastes, like musical appreciation, are hardly reducible to precise definitions. That is one reason I have always felt that "obscenity" was not an exception to the First Amendment. For matters of taste, like matters of belief, turn on the idiosyncrasies of individuals. They are too personal to define and too emotional and vague to apply, as witness the prison term for Ralph Ginzburg, *Ginzburg* v. *United States,* 383 U. S. 463, not for what he printed but for the sexy manner in which he advertised his creations.

The other reason I could not bring myself to conclude that "obscenity" was not covered by the First Amendment was that prior to the adoption of our Constitution and Bill of Rights the Colonies had no law excluding "obscenity" from the regime of freedom of expression and press that then existed. I could find no such laws; and more important, our leading colonial expert, Julius Goebel, could find none, J. Goebel, Development of Legal Institutions (1946); J. Goebel, Felony and Misdemeanor (1937). So I became convinced that the

creation of the "obscenity" exception to the First Amendment was a legislative and judicial *tour de force;* that if we were to have such a regime of censorship and punishment, it should be done by constitutional amendment.

People are, of course, offended by many offerings made by merchants in this area. They are also offended by political pronouncements, sociological themes, and by stories of official misconduct. The list of activities and publications and pronouncements that offend someone is endless. Some of it goes on in private; some of it is inescapably public, as when a government official generates crime, becomes a blatant offender of the moral sensibilities of the people, engages in burglary, or breaches the privacy of the telephone, the conference room, or the home. Life in this crowded modern technological world creates many offensive statements and many offensive deeds. There is no protection against offensive ideas, only against offensive conduct.

"Obscenity" at most is the expression of offensive ideas. There are regimes in the world where ideas "offensive" to the majority (or at least to those who control the majority) are suppressed. There life proceeds at a monotonous pace. Most of us would find that world offensive. One of the most offensive experiences in my life was a visit to a nation where bookstalls were filled only with books on mathematics and books on religion.

I am sure I would find offensive most of the books and movies charged with being obscene. But in a life that has not been short, I have yet to be trapped into seeing or reading something that would offend me. I never read or see the materials coming to the Court under charges of "obscenity," because I have thought the First Amendment made it unconstitutional for me to act as a censor. I see ads in bookstores and neon lights over theaters that resemble bait for those who

seek vicarious exhilaration. As a parent or a priest or as a teacher I would have no compunction in edging my children or wards away from the books and movies that did no more than excite man's base instincts. But I never supposed that government was permitted to sit in judgment on one's tastes or beliefs—save as they involved action within the reach of the police power of government.

I applaud the effort. of my Brother BRENNAN to forsake the low road which the Court has followed in this field. The new regime he would inaugurate is much closer than the old to the policy of abstention which the First Amendment proclaims. But since we do not have here the unique series of problems raised by government-imposed or government-approved captive audiences, cf. *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, I see no constitutional basis for fashioning a rule that makes a publisher, producer, bookseller, librarian, or movie house operator criminally responsible, when he fails to take affirmative steps to protect the consumer against literature, books, or movies offensive* to those who temporarily occupy the seats of the mighty.

---

*What we do today is rather ominous as respects librarians. The net now designed by the Court is so finely meshed that, taken literally, it could result in raids on libraries. Libraries, I had always assumed, were sacrosanct, representing every part of the spectrum. If what is offensive to the most influential person or group in a community can be purged from a library, the library system would be destroyed.

A few States exempt librarians from laws curbing distribution of "obscene" literature. California's law, however, provides: "Every person who, with knowledge that a person is a minor, or who fails to exercise reasonable care in ascertaining the true age of a minor, knowingly distributes to or sends or causes to be sent to, or exhibits to, or offers to distribute or exhibit any harmful matter to a minor, is guilty of a misdemeanor." Calif. Penal Code § 313.1.

A "minor" is one under 18 years of age; the word "distribute" means "to transfer possession"; "matter" includes "any book, maga-

When man was first in the jungle he took care of himself. When he entered a societal group, controls were necessarily imposed. But our society—unlike most in the world—presupposes that freedom and liberty are in a frame of reference that makes the individual, not government, the keeper of his tastes, beliefs, and ideas. That is the philosophy of the First Amendment; and it is the article of faith that sets us apart from most nations in the world.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART and MR. JUSTICE MARSHALL join, dissenting.

This case requires the Court to confront once again the vexing problem of reconciling state efforts to suppress sexually oriented expression with the protections of the First Amendment, as applied to the States through the Fourteenth Amendment. No other aspect of the First Amendment has, in recent years, demanded so substantial a commitment of our time, generated such disharmony of views, and remained so resistant to the formulation of stable and manageable standards. I am convinced that the approach initiated 16 years ago in *Roth* v. *United States*, 354 U. S. 476 (1957), and culminating in the Court's decision today, cannot bring stability to this area of the law without jeopardizing fundamental First Amendment values, and I have concluded that the

---

zine, newspaper, or other printed or written material." *Id.*, §§ 313 (b), (d), (g).

"Harmful matter" is defined in § 313 (a) to mean "matter, taken as a whole, the predominant appeal of which to the average person, applying contemporary standards, is to prurient interest, *i. e.*, a shameful or morbid interest in nudity, sex, or excretion; and is matter which taken as a whole goes substantially beyond customary limits of candor in description or representation of such matters; and is matter which taken as a whole is utterly without redeeming social importance for minors."

time has come to make a significant departure from that approach.

In this civil action in the Superior Court of Fulton County, the State of Georgia sought to enjoin the showing of two motion pictures, It All Comes Out In The End, and Magic Mirror, at the Paris Adult Theatres (I and II) in Atlanta, Georgia. The State alleged that the films were obscene under the standards set forth in Georgia Code Ann. § 26–2101.[1]  The trial court denied injunctive relief, holding that even though the films could be considered obscene, their commercial presentation could not constitutionally be barred in the absence of proof that they were shown to minors or unconsenting adults. Reversing, the Supreme Court of Georgia found the films obscene, and held that the care taken to avoid exposure to minors and unconsenting adults was without constitutional significance.

## I

The Paris Adult Theatres are two commercial cinemas, linked by a common box office and lobby, on Peachtree Street in Atlanta, Georgia. On December 28, 1970, investigators employed by the Criminal Court of Fulton County entered the theaters as paying customers and viewed each of the films which are the subject of this action. Thereafter, two separate complaints, one for

---

[1] Ga. Code Ann. § 26–2101 provides in pertinent part that

"(b) Material is obscene if considered as a whole, applying community standards, its predominant appeal is to prurient interest, that is, a shameful or morbid interest in nudity, sex or excretion, and utterly without redeeming social value and if, in addition, it goes substantially beyond customary limits of candor in describing or representing such matters. Undeveloped photographs, molds, printing plates and the like shall be deemed obscene notwithstanding that processing or other acts may be required to make the obscenity patent or to disseminate it."

each of the two films, were filed in the Superior Court seeking a declaration that the films were obscene and an injunction against their continued presentation to the public. The complaints alleged that the films were "a flagrant violation of Georgia Code Section 26–2101 in that the sole and dominant theme[s] of the said motion picture film[s] considered as a whole and applying contemporary community standards [appeal] to the prurient interest in sex, nudity and excretion, and that the said motion picture film[s are] utterly and absolutely without any redeeming social value whatsoever, and [transgress] beyond the customary limits of candor in describing and discussing sexual matters." App. 20, 39.

Although the language of the complaints roughly tracked the language of § 26–2101, which imposes criminal penalties on persons who knowingly distribute obscene materials,[2] this proceeding was not brought pursuant to that statute. Instead, the State initiated a nonstatutory civil proceeding to determine the obscenity of the films and to enjoin their exhibition. While the parties waived jury trial and stipulated that the decision of the trial court would be final on the issue of obscenity, the State has not indicated whether it intends to bring a criminal action under the statute in the event that it succeeds in proving the films obscene.

Upon the filing of the complaints, the trial court scheduled a hearing for January 13, 1971, and entered an order temporarily restraining the defendants from concealing, destroying, altering, or removing the films

---

[2] Ga. Code § 26–2101 (a):

"A person commits the offense of distributing obscene materials [as described in subsection (b), n. 1, *supra*] when he sells, lends, rents, leases, gives, advertises, publishes, exhibits or otherwise disseminates to any person any obscene material of any description, knowing the obscene nature thereof, or who offers to do so, or who possesses such material with the intent so to do . . . ."

from the jurisdiction, but not from exhibiting the films to the public *pendente lite.* In addition to viewing the films at the hearing, the trial court heard the testimony of witnesses and admitted into evidence photographs that were stipulated to depict accurately the facade of the theater. The witnesses testified that the exterior of the theater was adorned with prominent signs reading "Adults Only," "You Must Be 21 and Able to Prove It," and "If the Nude Body Offends You, Do Not Enter." Nothing on the outside of the theater described the films with specificity. Nor were pictures displayed on the outside of the theater to draw the attention of passersby to the contents of the films. The admission charge to the theaters was $3. The trial court heard no evidence that minors had ever entered the theater, but also heard no evidence that petitioners had enforced a systematic policy of screening out minors (apart from the posting of the notices referred to above).

On the basis of the evidence submitted, the trial court concluded that the films could fairly be considered obscene, "[a]ssuming that obscenity is established by a finding that the actors cavorted about in the nude indiscriminately," but held, nonetheless, that "the display of these films in a commercial theatre, when surrounded by requisite notice to the public of their nature and by reasonable protection against the exposure of these films to minors, is constitutionally permissible." [3]

---

[3] The precise holding of the trial court is not free from ambiguity. After pointing out that the films could be considered obscene, and that they still could not be suppressed in the absence of exposure to juveniles or unconsenting adults, the trial court concluded that "[i]t is the judgment of this court that the films, even though they display the human body and the human personality in a most degrading fashion, are not obscene." It is not clear whether the trial court found that the films were not obscene in the sense that they were protected expression under the standards of *Roth* v. *United States,* 354 U. S. 476 (1957), and *Redrup* v. *New York,* 386 U. S.

Since the issue did not arise in a statutory proceeding, the trial court was not required to pass upon the constitutionality of any state statute, on its face or as applied, in denying the injunction sought by the State.

The Supreme Court of Georgia unanimously reversed, reasoning that the lower court's reliance on *Stanley* v. *Georgia*, 394 U. S. 557 (1969), was misplaced in view of our subsequent decision in *United States* v. *Reidel*, 402 U. S. 351 (1971):

> "In [*Reidel*] the Supreme Court expressly held that the government could constitutionally prohibit the distribution of obscene materials through the mails, even though the distribution be limited to willing recipients who state that they are adults, and, further, that the constitutional right of a person to possess obscene material in the privacy of his own home, as expressed in the *Stanley* case, does not carry with it the right to sell and deliver such material. . . . Those who choose to pass through the front door of the defendant's theater and purchase a ticket to view the films and who certify thereby that they are more than 21 years of age are willing recipients of the material in the same legal sense as were those in the *Reidel* case, who, after reading the newspaper advertisements of the material, mailed an order to the defendant accepting his solicitation to sell them the obscene booklet there. That case clearly establishes once and for all that the sale and delivery of obscene material to willing adults is not

767 (1967), or whether it used the expression "not obscene" as a term of art to indicate that the films could not be suppressed even though they were not protected under the *Roth-Redrup* standards. In any case, the Georgia Supreme Court viewed the trial court's opinion as holding that the films could not be suppressed, even if they were unprotected expression, provided that they were not exhibited to juveniles or unconsenting adults.

protected under the first amendment." 228 Ga. 343, 346, 185 S. E. 2d 768, 769–770 (1971).

The decision of the Georgia Supreme Court rested squarely on its conclusion that the State could constitutionally suppress these films even if they were displayed only to persons over the age of 21 who were aware of the nature of their contents and who had consented to viewing them. For the reasons set forth in this opinion, I am convinced of the invalidity of that conclusion of law, and I would therefore vacate the judgment of the Georgia Supreme Court. I have no occasion to consider the extent of state power to regulate the distribution of sexually oriented materials to juveniles or to unconsenting adults. Nor am I required, for the purposes of this review, to consider whether or not these petitioners had, in fact, taken precautions to avoid exposure of films to minors or unconsenting adults.

## II

In *Roth* v. *United States,* 354 U. S. 476 (1957), the Court held that obscenity, although expression, falls outside the area of speech or press constitutionally protected under the First and Fourteenth Amendments against state or federal infringement. But at the same time we emphasized in *Roth* that "sex and obscenity are not synonymous," *id.,* at 487, and that matter which is sexually oriented but not obscene is fully protected by the Constitution. For we recognized that "[s]ex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern." *Ibid.*[4] *Roth* rested, in

_____

[4] "As to all such problems, this Court said in *Thornhill* v. *Alabama,* 310 U. S. 88, 101–102 (1940):

" 'The freedom of speech and of the press guaranteed by the

other words, on what has been termed a two-level approach to the question of obscenity.[5]  While much criticized,[6] that approach has been endorsed by all but two members of this Court who have addressed the question since *Roth*.  Yet our efforts to implement that approach demonstrate that agreement on the existence of something called "obscenity" is still a long and painful step from agreement on a workable definition of the term.

Recognizing that "the freedoms of expression . . . are vulnerable to gravely damaging yet barely visible encroachments," *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 66 (1963), we have demanded that "sensitive tools" be used to carry out the "separation of legitimate from illegitimate speech." *Speiser* v. *Randall,* 357 U. S. 513, 525 (1958).  The essence of our problem in the obscenity area is that we have been unable to provide "sensitive tools" to separate obscenity from other sexually oriented but constitutionally protected speech,

---

Constitution embraces at the least the liberty to discuss publicly and truthfully *all matters of public concern* without previous restraint or fear of subsequent punishment.  The exigencies of the colonial period and the efforts to secure freedom from oppressive administration developed a broadened conception of these liberties as adequate to supply the public need for *information and education with respect to the significant issues of the times. . . .* Freedom of discussion, if it would fulfill its historic function in this nation, must embrace *all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.'* (Emphasis added.)" *Roth,* 354 U. S., at 487–488.
See also, *e. g., Thomas* v. *Collins,* 323 U. S. 516, 531 (1945) ("the rights of free speech and a free press are not confined to any field of human interest").

[5] See, *e. g.,* Kalven, The Metaphysics of the Law of Obscenity, 1960 Sup. Ct. Rev. 1, 10–11; cf. *Beauharnais* v. *Illinois,* 343 U. S. 250 (1952).

[6] See, *e. g.,* T. Emerson, The System of Freedom of Expression 487 (1970); Kalven, *supra,* n. 5; Comment, More Ado About Dirty Books, 75 Yale L. J. 1364 (1966).

so that efforts to suppress the former do not spill over into the suppression of the latter. The attempt, as the late Mr. Justice Harlan observed, has only "produced a variety of views among the members of the Court unmatched in any other course of constitutional adjudication." *Interstate Circuit, Inc.* v. *Dallas,* 390 U. S. 676, 704–705 (1968) (separate opinion).

To be sure, five members of the Court did agree in *Roth* that obscenity could be determined by asking "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 354 U. S., at 489. But agreement on that test—achieved in the abstract and without reference to the particular material before the Court, see *id.,* at 481 n. 8—was, to say the least, short lived. By 1967 the following views had emerged: Mr. Justice Black and MR. JUSTICE DOUGLAS consistently maintained that government is wholly powerless to regulate any sexually oriented matter on the ground of its obscenity. See, *e. g., Ginzburg* v. *United States,* 383 U. S. 463, 476, 482 (1966) (dissenting opinions); *Jacobellis* v. *Ohio,* 378 U. S. 184, 196 (1964) (concurring opinion); *Roth* v. *United States, supra,* at 508 (dissenting opinion). Mr. Justice Harlan, on the other hand, believed that the Federal Government in the exercise of its enumerated powers could control the distribution of "hard core" pornography, while the States were afforded more latitude to "[ban] any material which, taken as a whole, has been reasonably found in state judicial proceedings to treat with sex in a fundamentally offensive manner, under rationally established criteria for judging such material." *Jacobellis* v. *Ohio, supra,* at 204 (dissenting opinion). See also, *e. g., Ginzburg* v. *United States, supra,* at 493 (dissenting opinion); *A Quantity of Books* v. *Kansas,* 378 U. S. 205, 215 (1964) (dissenting opinion joined by Clark, J.); *Roth, supra,* at 496

(separate opinion). MR. JUSTICE STEWART regarded "hard core" pornography as the limit of both federal and state power. See, e. g., *Ginzburg* v. *United States, supra,* at 497 (dissenting opinion); *Jacobellis* v. *Ohio, supra,* at 197 (concurring opinion).

The view that, until today, enjoyed the most, but not majority, support was an interpretation of *Roth* (and not, as the Court suggests, a veering "sharply away from the *Roth* concept" and the articulation of "a new test of obscenity," *Miller* v. *California, ante,* at 21) adopted by Mr. Chief Justice Warren, Mr. Justice Fortas, and the author of this opinion in *Memoirs* v. *Massachusetts,* 383 U. S. 413 (1966). We expressed the view that Federal or State Governments could control the distribution of material where "three elements . . . coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." *Id.,* at 418. Even this formulation, however, concealed differences of opinion. Compare *Jacobellis* v. *Ohio, supra,* at 192–195 (BRENNAN, J., joined by Goldberg, J.) (community standards national), with *id.,* at 200–201 (Warren, C. J., joined by Clark, J., dissenting) (community standards local).[7] Moreover, it did not provide a definition covering all situations. See *Mishkin* v. *New York,* 383 U. S. 502 (1966)

---

[7] On the question of community standards see also *Hoyt* v. *Minnesota,* 399 U. S. 524 (1970) (BLACKMUN, J., joined by BURGER, C. J., and Harlan, J., dissenting) (flexibility for state standards); *Cain* v. *Kentucky,* 397 U. S. 319 (1970) (BURGER, C. J., dissenting) (same); *Manual Enterprises* v. *Day,* 370 U. S. 478, 488 (1962) (Harlan, J., joined by STEWART, J.) (national standards in context of federal prosecution).

(prurient appeal defined in terms of a deviant sexual group); *Ginzburg* v. *United States, supra* ("pandering" probative evidence of obscenity in close cases). See also *Ginsberg* v. *New York*, 390 U. S. 629 (1968) (obscenity for juveniles). Nor, finally, did it ever command a majority of the Court. Aside from the other views described above, Mr. Justice Clark believed that "social importance" could only "be considered together with evidence that the material in question appeals to prurient interest and is patently offensive." *Memoirs* v. *Massachusetts, supra*, at 445 (dissenting opinion). Similarly, MR. JUSTICE WHITE regarded "a publication to be obscene if its predominant theme appeals to the prurient interest in a manner exceeding customary limits of candor," *id.*, at 460–461 (dissenting opinion), and regarded " 'social importance' . . . not [as] an independent test of obscenity but [as] relevant only to determining the predominant prurient interest of the material . . . ." *Id.*, at 462.

In the face of this divergence of opinion the Court began the practice in *Redrup* v. *New York*, 386 U. S. 767 (1967), of *per curiam* reversals of convictions for the dissemination of materials that at least five members of the Court, applying their separate tests, deemed not to be obscene.[8] This approach capped the attempt in

---

[8] No fewer than 31 cases have been disposed of in this fashion. Aside from the three cases reversed in *Redrup*, they are: *Keney* v. *New York*, 388 U. S. 440 (1967); *Friedman* v. *New York*, 388 U. S. 441 (1967); *Ratner* v. *California*, 388 U. S. 442 (1967); *Cobert* v. *New York*, 388 U. S. 443 (1967); *Sheperd* v. *New York*, 388 U. S. 444 (1967); *Avansino* v. *New York*, 388 U. S. 446 (1967); *Aday* v. *New York*, 388 U. S. 447 (1967); *Books, Inc.* v. *United States*, 388 U. S. 449 (1967); *A Quantity of Books* v. *Kansas*, 388 U. S. 452 (1967); *Mazes* v. *Ohio*, 388 U. S. 453 (1967); *Schackman* v. *California*, 388 U. S. 454 (1967); *Potomac News Co.* v. *United States*, 389 U. S. 47 (1967); *Conner* v. *City of Hammond*, 389 U. S. 48 (1967); *Central Magazine Sales, Ltd.* v. *United States*,

*Roth* to separate all forms of sexually oriented expression into two categories—the one subject to full governmental suppression and the other beyond the reach of governmental regulation to the same extent as any other protected form of speech or press. Today a majority of the Court offers a slightly altered formulation of the basic *Roth* test, while leaving entirely unchanged the underlying approach.

## III

Our experience with the *Roth* approach has certainly taught us that the outright suppression of obscenity cannot be reconciled with the fundamental principles of the First and Fourteenth Amendments. For we have failed to formulate a standard that sharply distinguishes protected from unprotected speech, and out of necessity, we have resorted to the *Redrup* approach, which resolves cases as between the parties, but offers only the most obscure guidance to legislation, adjudication by other courts, and primary conduct. By disposing of cases through summary reversal or denial of certiorari we have deliberately and effectively obscured the rationale underlying the decisions. It comes as no surprise that judicial attempts to follow our lead conscientiously have often ended in hopeless confusion.

Of course, the vagueness problem would be largely of our own creation if it stemmed primarily from our

389 U. S. 50 (1967); *Chance* v. *California,* 389 U. S. 89 (1967); *I. M. Amusement Corp.* v. *Ohio,* 389 U. S. 573 (1968); *Robert-Arthur Management Corp.* v. *Tennessee,* 389 U. S. 578 (1968); *Felton* v. *City of Pensacola,* 390 U. S. 340 (1968); *Henry* v. *Louisiana,* 392 U. S. 655 (1968); *Cain* v. *Kentucky, supra; Bloss* v. *Dykema,* 398 U. S. 278 (1970); *Walker* v. *Ohio,* 398 U. S. 434 (1970); *Hoyt* v. *Minnesota, supra; Childs* v. *Oregon,* 401 U. S. 1006 (1971); *Bloss* v. *Michigan,* 402 U. S. 938 (1971); *Burgin* v. *South Carolina,* 404 U. S. 809 (1971); *Hartstein* v. *Missouri,* 404 U. S. 988 (1971); *Wiener* v. *California,* 404 U. S. 988 (1971).

failure to reach a consensus on any one standard. But after 16 years of experimentation and debate I am reluctantly forced to the conclusion that none of the available formulas, including the one announced today, can reduce the vagueness to a tolerable level while at the same time striking an acceptable balance between the protections of the First and Fourteenth Amendments, on the one hand, and on the other the asserted state interest in regulating the dissemination of certain sexually oriented materials. Any effort to draw a constitutionally acceptable boundary on state power must resort to such indefinite concepts as "prurient interest," "patent offensiveness," "serious literary value," and the like. The meaning of these concepts necessarily varies with the experience, outlook, and even idiosyncrasies of the person defining them. Although we have assumed that obscenity does exist and that we "know it when [we] see it," *Jacobellis* v. *Ohio, supra,* at 197 (STEWART, J., concurring), we are manifestly unable to describe it in advance except by reference to concepts so elusive that they fail to distinguish clearly between protected and unprotected speech.

We have more than once previously acknowledged that "constitutionally protected expression . . . is often separated from obscenity only by a dim and uncertain line." *Bantam Books, Inc.* v. *Sullivan,* 372 U. S., at 66. See also, *e. g., Mishkin* v. *New York, supra,* at 511. Added to the "perhaps inherent residual vagueness" of each of the current multitude of standards, *Ginzburg* v. *United States, supra,* at 475 n. 19, is the further complication that the obscenity of any particular item may depend upon nuances of presentation and the context of its dissemination. See *ibid. Redrup* itself suggested that obtrusive exposure to unwilling individuals, distribution to juveniles, and "pandering" may also bear upon the determination of

obscenity. See *Redrup* v. *New York, supra, at* 769. As Mr. Chief Justice Warren stated in a related vein, obscenity is a function of the circumstances of its dissemination:

> "It is not the book that is on trial; it is a person. The conduct of the defendant is the central issue, not the obscenity of a book or picture. The nature of the materials is, of course, relevant as an attribute of the defendant's conduct, but the materials are thus placed in context from which they draw color and character." *Roth,* 354 U. S., at 495 (concurring opinion).

See also, *e. g., Jacobellis* v. *Ohio, supra,* at 201 (dissenting opinion); *Kingsley Books, Inc.* v. *Brown,* 354 U. S. 436, 445–446 (1957) (dissenting opinion). I need hardly point out that the factors which must be taken into account are judgmental and can only be applied on "a case-by-case, sight-by-sight" basis. *Mishkin* v. *New York, supra,* at 516 (Black, J., dissenting). These considerations suggest that no one definition, no matter how precisely or narrowly drawn, can possibly suffice for all situations, or carve out fully suppressible expression from all media without also creating a substantial risk of encroachment upon the guarantees of the Due Process Clause and the First Amendment.[9]

---

[9] Although I did not join the opinion of the Court in *Stanley* v. *Georgia,* 394 U. S. 557 (1969), I am now inclined to agree that "the Constitution protects the right to receive information and ideas," and that "[t]his right to receive information and ideas, regardless of their social worth . . . is fundamental to our free society." *Id.,* at 564. See *Martin* v. *City of Struthers,* 319 U. S. 141, 143 (1943); *Winters* v. *New York,* 333 U. S. 507, 510 (1948); *Lamont* v. *Postmaster General,* 381 U. S. 301, 307–308 (1965) (concurring opinion). This right is closely tied, as *Stanley* recognized, to "the right to be free, except in very limited circumstances, from unwarranted governmental intrusions into one's privacy." 394 U. S., at 564. See *Griswold* v.

The vagueness of the standards in the obscenity area produces a number of separate problems, and any improvement must rest on an understanding that the problems are to some extent distinct. First, a vague statute fails to provide adequate notice to persons who are engaged in the type of conduct that the statute could be thought to proscribe. The Due Process Clause of the Fourteenth Amendment requires that all criminal laws provide fair notice of "what the State commands or forbids." *Lanzetta* v. *New Jersey,* 306 U. S. 451, 453 (1939); *Connally* v. *General Construction Co.,* 269 U. S. 385 (1926). In the service of this general principle we have repeatedly held that the definition of obscenity must provide adequate notice of exactly what

*Connecticut,* 381 U. S. 479 (1965); *Olmstead* v. *United States,* 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting). It is similarly related to "the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child" (italics omitted), *Eisenstadt* v. *Baird,* 405 U. S. 438, 453 (1972), and the right to exercise "autonomous control over the development and expression of one's intellect, interests, tastes, and personality." (Italics omitted.) *Doe* v. *Bolton,* 410 U. S. 179, 211 (1973) (DOUGLAS, J., concurring). It seems to me that the recognition of these intertwining rights calls in question the validity of the two-level approach recognized in *Roth.* After all, if a person has the right to receive information without regard to its social worth—that is, without regard to its obscenity—then it would seem to follow that a State could not constitutionally punish one who undertakes to provide this information to a *willing, adult recipient.* See *Eisenstadt* v. *Baird, supra,* at 443–446. In any event, I need not rely on this line of analysis or explore all of its possible ramifications, for there is available a narrower basis on which to rest this decision. Whether or not a class of "obscene" and thus entirely unprotected speech does exist, I am forced to conclude that the class is incapable of definition with sufficient clarity to withstand attack on vagueness grounds. Accordingly, it is on principles of the void-for-vagueness doctrine that this opinion exclusively relies.

is prohibited from dissemination. See, *e. g., Rabe* v. *Washington,* 405 U. S. 313 (1972); *Interstate Circuit, Inc.* v. *Dallas,* 390 U. S. 676 (1968); *Winters* v. *New York,* 333 U. S. 507 (1948). While various tests have been upheld under the Due Process Clause, see *Ginsberg* v. *New York,* 390 U. S., at 643; *Mishkin* v. *New York,* 383 U. S., at 506–507; *Roth* v. *United States,* 354 U. S., at 491–492, I have grave doubts that any of those tests could be sustained today. For I know of no satisfactory answer to the assertion by Mr. Justice Black, "after the fourteen separate opinions handed down" in the trilogy of cases decided in 1966, that "no person, not even the most learned judge much less a layman, is capable of knowing in advance of an ultimate decision in his particular case by this Court whether certain material comes within the area of 'obscenity' . . . ." *Ginzburg* v. *United States,* 383 U. S., at 480–481 (dissenting opinion). See also the statement of Mr. Justice Harlan in *Interstate Circuit, Inc.* v. *Dallas, supra,* at 707 (separate opinion). As Mr. Chief Justice Warren pointed out, "[t]he constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States* v. *Harriss,* 347 U. S. 612, 617 (1954). In this context, even the most painstaking efforts to determine in advance whether certain sexually oriented expression is obscene must inevitably prove unavailing. For the insufficiency of the notice compels persons to guess not only whether their conduct is covered by a criminal statute, but also whether their conduct falls within the constitutionally permissible reach of the statute. The resulting level of uncertainty is utterly intolerable, not alone because it makes

"[b]ookselling . . . a hazardous profession," *Ginsberg* v. *New York, supra,* at 674 (Fortas, J., dissenting), but as well because it invites arbitrary and erratic enforcement of the law. See, *e. g., Papachristou* v. *City of Jacksonville,* 405 U. S. 156 (1972); *Gregory* v. *City of Chicago,* 394 U. S. 111, 120 (1969) (Black, J., concurring); *Niemotko* v. *Maryland,* 340 U. S. 268 (1951); *Cantwell* v. *Connecticut,* 310 U. S. 296, 308 (1940); *Thornhill* v. *Alabama,* 310 U. S. 88 (1940).

In addition to problems that arise when any criminal statute fails to afford fair notice of what it forbids, a vague statute in the areas of speech and press creates a second level of difficulty. We have indicated that "stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser." [10] *Smith* v. *California,* 361 U. S. 147, 151 (1959). That proposition draws its strength from our recognition that

> "[t]he fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth. Ceaseless vigilance is the watchword to prevent their erosion by Congress or by the States. The door barring federal and state intrusion into this area cannot be left ajar . . . ." *Roth, supra,* at 488.[11]

---

[10] In this regard, the problems of vagueness and overbreadth are, plainly, closely intertwined. See *NAACP* v. *Button,* 371 U. S. 415, 432–433 (1963); Note, The First Amendment Overbreadth Doctrine, 83 Harv. L. Rev. 844, 845 (1970). Cf. *infra,* at 93–94.

[11] See also *Speiser* v. *Randall,* 357 U. S. 513 (1958); cf. *Barenblatt* v. *United States,* 360 U. S. 109, 137–138 (1959) (Black, J., dissenting):

"This Court . . . has emphasized that the 'vice of vagueness' is

To implement this general principle, and recognizing the inherent vagueness of any definition of obscenity, we have held that the definition of obscenity must be drawn as narrowly as possible so as to minimize the interference with protected expression. Thus, in *Roth* we rejected the test of *Regina* v. *Hicklin,* [1868] L. R. 3 Q. B. 360, that "[judged] obscenity by the effect of isolated passages upon the most susceptible persons." 354 U. S., at 489. That test, we held in *Roth,* "might well encompass material legitimately treating with sex . . . ." *Ibid.* Cf. *Mishkin* v. *New York, supra,* at 509. And we have supplemented the *Roth* standard with additional tests in an effort to hold in check the corrosive effect of vagueness on the guarantees of the First Amendment.[12] We have held, for example, that "a State is not free to adopt whatever procedures it pleases

especially pernicious where legislative power over an area involving speech, press, petition and assembly is involved. . . . For a statute broad enough to support infringement of speech, writings, thoughts and public assemblies, against the unequivocal command of the First Amendment necessarily leaves all persons to guess just what the law really means to cover, and fear of a wrong guess inevitably leads people to forego the very rights the Constitution sought to protect above all others. Vagueness becomes even more intolerable in this area if one accepts, as the Court today does, a balancing test to decide if First Amendment rights shall be protected. It is difficult at best to make a man guess—at the penalty of imprisonment—whether a court will consider the State's need for certain information superior to society's interest in unfettered freedom. It is unconscionable to make him choose between the right to keep silent and the need to speak when the statute supposedly establishing the 'state's interest' is too vague to give him guidance." (Citations omitted.)

[12] Note, The First Amendment Overbreadth Doctrine, 83 Harv. L. Rev. 844, 885–886 and n. 158 (1970) ("Thus in the area of obscenity the overbreadth doctrine operates interstitially, when no line of privilege is apposite or yet to be found, to control the impact of schemes designed to curb distribution of unprotected material").

for dealing with obscenity . . . ." *Marcus* v. *Search Warrant,* 367 U. S. 717, 731 (1961). "Rather, the First Amendment requires that procedures be incorporated that 'ensure against the curtailment of constitutionally protected expression . . . .' " *Blount* v. *Rizzi,* 400 U. S. 410, 416 (1971), quoting from *Bantam Books, Inc.,* v. *Sullivan,* 372 U. S., at 66. See generally *Rizzi, supra,* at 417; *United States* v. *Thirty-seven Photographs,* 402 U. S. 363, 367–375 (1971); *Lee Art Theatre, Inc.* v. *Virginia,* 392 U. S. 636 (1968); *Freedman* v. *Maryland,* 380 U. S. 51, 58–60 (1965); *A Quantity of Books* v. *Kansas,* 378 U. S. 205 (1964) (plurality opinion).

Similarly, we have held that a State cannot impose criminal sanctions for the possession of obscene material absent proof that the possessor had knowledge of the contents of the material. *Smith* v. *California, supra.* "Proof of scienter" is necessary "to avoid the hazard of self-censorship of constitutionally protected material and to compensate for the ambiguities inherent in the definition of obscenity." *Mishkin* v. *New York, supra,* at 511; *Ginsberg* v. *New York, supra,* at 644–645. In short,

> "[t]he objectionable quality of vagueness and over-breadth . . . [is] the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. Cf. *Marcus* v. *Search Warrant,* 367 U. S. 717, 733. These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. Cf. *Smith* v. *California,* [361 U. S.], at 151–154; *Speiser* v. *Randall,* 357 U. S. 513, 526. Because First Amendment freedoms need breathing space to survive, government

may regulate in the area only with narrow specificity. *Cantwell* v. *Connecticut,* 310 U. S. 296, 311." *NAACP* v. *Button,* 371 U. S. 415, 432–433 (1963).

The problems of fair notice and chilling protected speech are very grave standing alone. But it does not detract from their importance to recognize that a vague statute in this area creates a third, although admittedly more subtle, set of problems. These problems concern the institutional stress that inevitably results where the line separating protected from unprotected speech is excessively vague. In *Roth* we conceded that "there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls . . . ." 354 U. S., at 491–492. Our subsequent experience demonstrates that almost every case is "marginal." And since the "margin" marks the point of separation between protected and unprotected speech, we are left with a system in which almost every obscenity case presents a constitutional question of exceptional difficulty. "The suppression of a particular writing or other tangible form of expression is . . . an *individual* matter, and in the nature of things every such suppression raises an individual constitutional problem, in which a reviewing court must determine for *itself* whether the attacked expression is suppressable within constitutional standards." *Roth, supra,* at 497 (separate opinion of Harlan, J.).

Examining the rationale, both explicit and implicit, of our vagueness decisions, one commentator has viewed these decisions as an attempt by the Court to establish an "insulating buffer zone of added protection at the peripheries of several of the Bill of Rights freedoms." Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U. Pa. L. Rev. 67, 75 (1960). The buffer zone enables the Court to fend off legislative attempts

"to pass to the courts—and ultimately to the Supreme Court—the awesome task of making case by case at once the criminal and the constitutional law." *Id.*, at 81. Thus,

> "[b]ecause of the Court's limited power to re-examine fact on a cold record, what appears to be going on in the administration of the law must be forced, by restrictive procedures, to reflect what is really going on; and because of the impossibility, through sheer volume of cases, of the Court's effectively policing law administration case by case, those procedures must be framed to assure, as well as procedures can assure, a certain overall *probability* of regularity. *Id.*, at 89 (emphasis in original).

As a result of our failure to define standards with predictable application to any given piece of material, there is no probability of regularity in obscenity decisions by state and lower federal courts. That is not to say that these courts have performed badly in this area or paid insufficient attention to the principles we have established. The problem is, rather, that one cannot say with certainty that material is obscene until at least five members of this Court, applying inevitably obscure standards, have pronounced it so. The number of obscenity cases on our docket gives ample testimony to the burden that has been placed upon this Court.

But the sheer number of the cases does not define the full extent of the institutional problem. For, quite apart from the number of cases involved and the need to make a fresh constitutional determination in each case, we are tied to the "absurd business of perusing and viewing the miserable stuff that pours into the Court . . . ." *Interstate Circuit, Inc.* v. *Dallas*, 390 U. S., at 707 (separate opinion of Harlan, J.). While the material may have varying degrees of social importance,

it is hardly a source of edification to the members of this Court who are compelled to view it before passing on its obscenity. Cf. *Mishkin* v. *New York,* 383 U. S., at 516–517 (Black, J., dissenting).

Moreover, we have managed the burden of deciding scores of obscenity cases by relying on *per curiam* reversals or denials of certiorari—a practice which conceals the rationale of decision and gives at least the appearance of arbitrary action by this Court. See *Bloss* v. *Dykema,* 398 U. S. 278 (1970) (Harlan, J., dissenting). More important, no less than the procedural schemes struck down in such cases as *Blount* v. *Rizzi, supra,* and *Freedman* v. *Maryland, supra,* the practice effectively censors protected expression by leaving lower court determinations of obscenity intact even though the status of the allegedly obscene material is entirely unsettled until final review here. In addition, the uncertainty of the standards creates a continuing source of tension between state and federal courts, since the need for an independent determination by this Court seems to render superfluous even the most conscientious analysis by state tribunals. And our inability to justify our decisions with a persuasive rationale—or indeed, any rationale at all—necessarily creates the impression that we are merely second-guessing state court judges.

The severe problems arising from the lack of fair notice, from the chill on protected expression, and from the stress imposed on the state and federal judicial machinery persuade me that a significant change in direction is urgently required. I turn, therefore, to the alternatives that are now open.

## IV

1. The approach requiring the smallest deviation from our present course would be to draw a new line between protected and unprotected speech, still permit-

ting the States to suppress all material on the unprotected side of the line.   In my view, clarity cannot be obtained pursuant to this approach except by drawing a line that resolves all doubt in favor of state power and against the guarantees of the First Amendment.   We could hold, for example, that any depiction or description of human sexual organs, irrespective of the manner or purpose of the portrayal, is outside the protection of the First Amendment and therefore open to suppression by the States.   That formula would, no doubt, offer much fairer notice of the reach of any state statute drawn at the boundary of the State's constitutional power. And it would also, in all likelihood, give rise to a substantial probability of regularity in most judicial determinations under the standard.   But such a standard would be appallingly overbroad, permitting the suppression of a vast range of literary, scientific, and artistic masterpieces.   Neither the First Amendment nor any free community could possibly tolerate such a standard.   Yet short of that extreme it is hard to see how any choice of words could reduce the vagueness problem to tolerable proportions, so long as we remain committed to the view that some class of materials is subject to outright suppression by the State.

2. The alternative adopted by the Court today recognizes that a prohibition against any depiction or description of human sexual organs could not be reconciled with the guarantees of the First Amendment.   But the Court does retain the view that certain sexually oriented material can be considered obscene and therefore unprotected by the First and Fourteenth Amendments.   To describe that unprotected class of expression, the Court adopts a restatement of the *Roth-Memoirs* definition of obscenity: "The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the

work, taken as a whole, appeals to the prurient interest . . . (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller* v. *California, ante,* at 24. In apparent illustration of "sexual conduct," as that term is used in the test's second element, the Court identifies "(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated," and "(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." *Id.,* at 25.

The differences between this formulation and the three-pronged *Memoirs* test are, for the most part, academic.[13] The first element of the Court's test is virtually identical to the *Memoirs* requirement that "the dominant theme of the material taken as a whole [must appeal] to a prurient interest in sex." 383 U. S., at 418. Whereas the second prong of the *Memoirs* test demanded that the material be

---

[13] While the Court's modification of the *Memoirs* test is small, it should still prove sufficient to invalidate virtually every state law relating to the suppression of obscenity. For, under the Court's restatement, a statute must specifically enumerate certain forms of sexual conduct, the depiction of which is to be prohibited. It seems highly doubtful to me that state courts will be able to construe state statutes so as to incorporate a carefully itemized list of various forms of sexual conduct, and thus to bring them into conformity with the Court's requirements. Cf. *Blount* v. *Rizzi,* 400 U. S. 410, 419 (1971). The statutes of at least one State should, however, escape the wholesale invalidation. Oregon has recently revised its statute to prohibit only the distribution of obscene materials to juveniles or unconsenting adults. The enactment of this principle is, of course, a choice constitutionally open to every State, even under the Court's decision. See Oregon Laws 1971, c. 743, Art. 29, §§ 255–262.

"patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters," *ibid.,* the test adopted today requires that the material describe, "in a patently offensive way, sexual conduct specifically defined by the applicable state law." *Miller* v. *California, ante,* at 24. The third component of the *Memoirs* test is that the material must be "utterly without redeeming social value." 383 U. S., at 418. The Court's rephrasing requires that the work, taken as a whole, must be proved to lack "serious literary, artistic, political, or scientific value." *Miller, ante,* at 24.

The Court evidently recognizes that difficulties with the *Roth* approach necessitate a significant change of direction. But the Court does not describe its understanding of those difficulties, nor does it indicate how the restatement of the *Memoirs* test is in any way responsive to the problems that have arisen. In my view, the restatement leaves unresolved the very difficulties that compel our rejection of the underlying *Roth* approach, while at the same time contributing substantial difficulties of its own. The modification of the *Memoirs* test may prove sufficient to jeopardize the analytic underpinnings of the entire scheme. And today's restatement will likely have the effect, whether or not intended, of permitting far more sweeping suppression of sexually oriented expression, including expression that would almost surely be held protected under our current formulation.

Although the Court's restatement substantially tracks the three-part test announced in *Memoirs* v. *Massachusetts, supra,* it does purport to modify the "social value" component of the test. Instead of requiring, as did *Roth* and *Memoirs,* that state suppression be limited to materials utterly lacking in social value, the Court today

permits suppression if the government can prove that the materials lack *"serious* literary, artistic, political or scientific value." But the definition of "obscenity" as expression utterly lacking in social importance is the key to the conceptual basis of *Roth* and our subsequent opinions. In *Roth* we held that certain expression is obscene, and thus outside the protection of the First Amendment, precisely *because* it lacks even the slightest redeeming social value. See *Roth* v. *United States,* 354 U. S., at 484–485; [14] *Jacobellis* v. *Ohio,* 378 U. S., at 191; *Zeitlin* v. *Arnebergh,* 59 Cal. 2d 901, 920, 383 P. 2d 152, 165; cf. *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964); *Garrison* v. *Louisiana,* 379 U. S. 64, 75 (1964); *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572 (1942); Kalven, The Metaphysics of the Law of Obscenity, 1960 Sup. Ct. Rev. 1. The Court's approach necessarily assumes that some works will be deemed obscene—even though they clearly have *some* social value—because the State was able to prove that the value, measured by some unspecified standard, was not sufficiently "serious" to warrant constitutional protection. That result is not merely inconsistent with our holding in *Roth;* it is nothing less than a rejection of the fundamental First Amendment premises and rationale of the *Roth* opinion and an invitation to widespread suppression of sexually oriented speech. Before today, the protections of the First Amendment have never been thought limited to expressions of *serious* literary or political value. See *Gooding* v. *Wilson,* 405 U. S. 518

---

[14] "All ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance." *Roth* v. *United States, supra,* at 484.

(1972); *Cohen* v. *California,* 403 U. S. 15, 25–26 (1971);
*Terminiello* v. *Chicago,* 337 U. S. 1, 4–5 (1949).

Although the Court concedes that *"Roth* presumed
'obscenity' to be 'utterly without redeeming social impor-
tance,' " it argues that *Memoirs* produced "a drastically
altered test that called on the prosecution to prove a
negative, *i. e.,* that the material was 'utterly without
redeeming social value'—a burden virtually impossible
to discharge under our criminal standards of proof." [15]
One should hardly need to point out that under the third
component of the Court's test the prosecution is still
required to "prove a negative"—*i. e.,* that the material
lacks serious literary, artistic, political, or scientific value.
Whether it will be easier to prove that material lacks
"serious" value than to prove that it lacks any value at
all remains, of course, to be seen.

In any case, even if the Court's approach left undam-
aged the conceptual framework of *Roth,* and even if it
clearly barred the suppression of works with at least some
social value, I would nevertheless be compelled to reject
it. For it is beyond dispute that the approach can have
no ameliorative impact on the cluster of problems that
grow out of the vagueness of our current standards. In-
deed, even the Court makes no argument that the refor-
mulation will provide fairer notice to booksellers, theater
owners, and the reading and viewing public. Nor does
the Court contend that the approach will provide clearer
guidance to law enforcement officials or reduce the chill
on protected expression. Nor, finally, does the Court
suggest that the approach will mitigate to the slightest
degree the institutional problems that have plagued this
Court and the state and federal judiciary as a direct
result of the uncertainty inherent in any definition of
obscenity.

---

[15] *Miller* v. *California, ante,* at 22.

Of course, the Court's restated *Roth* test does limit the definition of obscenity to depictions of physical conduct and explicit sexual acts. And that limitation may seem, at first glance, a welcome and clarifying addition to the *Roth-Memoirs* formula. But, just as the agreement in *Roth* on an abstract definition of obscenity gave little hint of the extreme difficulty that was to follow in attempting to apply that definition to specific material, the mere formulation of a "physical conduct" test is no assurance that it can be applied with any greater facility. The Court does not indicate how it would apply its test to the materials involved in *Miller* v. *California, supra,* and we can only speculate as to its application. But even a confirmed optimist could find little realistic comfort in the adoption of such a test. Indeed, the valiant attempt of one lower federal court to draw the constitutional line at depictions of explicit sexual conduct seems to belie any suggestion that this approach marks the road to clarity.[16] The Court surely demonstrates little sensitivity to our own institutional problems, much less the other vagueness-related difficulties, in establishing a system that requires us to consider whether a description of human genitals is sufficiently "lewd" to deprive it of constitutional protection; whether a sexual act is "ultimate"; whether the conduct depicted in materials before us fits within one of the categories of conduct whose depiction the State and Federal Governments have attempted to suppress; and a host of equally pointless inquiries. In addition, adoption of such a test does not, presumably, obviate the need for consideration of the

---

[16] *Huffman* v. *United States,* 152 U. S. App. D. C. 238, 470 F. 2d 386 (1971). The test apparently requires an effort to distinguish between "singles" and "duals," between "erect penises" and "semierect penises," and between "ongoing sexual activity" and "imminent sexual activity."

nuances of presentation of sexually oriented material, yet it hardly clarifies the application of those opaque but important factors.

If the application of the "physical conduct" test to pictorial material is fraught with difficulty, its application to textual material carries the potential for extraordinary abuse. Surely we have passed the point where the mere written description of sexual conduct is deprived of First Amendment protection. Yet the test offers no guidance to us, or anyone else, in determining which written descriptions of sexual conduct are protected, and which are not.

Ultimately, the reformulation must fail because it still leaves in this Court the responsibility of determining in each case whether the materials are protected by the First Amendment. The Court concedes that even under its restated formulation, the First Amendment interests at stake require "appellate courts to conduct an independent review of constitutional claims when necessary," *Miller* v. *California, ante,* at 25, citing Mr. Justice Harlan's opinion in *Roth,* where he stated, "I do not understand how the Court can resolve the constitutional problems now before it without making its own independent judgment upon the character of the material upon which these convictions were based." 354 U. S., at 498. Thus, the Court's new formulation will not relieve us of "the awesome task of making case by case at once the criminal and the constitutional law." [17] And the careful efforts of state and lower federal courts to apply the standard will remain an essentially pointless exercise, in view of the need for an ultimate decision by this Court. In addition, since the status of sexually oriented material will necessarily remain in doubt until final

---

[17] Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U. Pa. L. Rev. 67, 81 (1960).

decision by this Court, the new approach will not diminish the chill on protected expression that derives from the uncertainty of the underlying standard. I am convinced that a definition of obscenity in terms of physical conduct cannot provide sufficient clarity to afford fair notice, to avoid a chill on protected expression, and to minimize the institutional stress, so long as that definition is used to justify the outright suppression of any material that is asserted to fall within its terms.

3. I have also considered the possibility of reducing our own role, and the role of appellate courts generally, in determining whether particular matter is obscene. Thus, we might conclude that juries are best suited to determine obscenity *vel non* and that jury verdicts in this area should not be set aside except in cases of extreme departure from prevailing standards. Or, more generally, we might adopt the position that where a lower federal or state court has conscientiously applied the constitutional standard, its finding of obscenity will be no more vulnerable to reversal by this Court than any finding of fact. Cf. *Interstate Circuit, Inc.* v. *Dallas,* 390 U. S., at 706–707 (separate opinion of Harlan, J.). While the point was not clearly resolved prior to our decision in *Redrup* v. *New York,* 386 U. S. 767 (1967),[18] it is implicit in that decision that the First Amendment requires

---

[18] Compare *Ginsberg* v. *New York,* 390 U. S. 629, 672 (1968) (Fortas, J., dissenting); *Jacobellis* v. *Ohio,* 378 U. S. 184, 187–190 (1964) (BRENNAN, J., joined by Goldberg, J.); *Manual Enterprises* v. *Day,* 370 U. S., at 488 (Harlan, J., joined by STEWART, J.); and *Kingsley Pictures Corp.* v. *Regents,* 360 U. S. 684, 696–697 (1959) (Frankfurter, J., concurring); *id.,* at 708 (Harlan, J., joined by Frankfurter, J., and Whittaker, J., concurring), with *Jacobellis* v. *Ohio, supra,* at 202–203 (Warren, C. J., joined by Clark, J., dissenting); *Roth* v. *United States,* 354 U. S., at 492 n. 30; and *Kingsley Books, Inc.* v. *Brown,* 354 U. S. 436, 448 (1957) (BRENNAN, J., dissenting). See also *Walker* v. *Ohio,* 398 U. S. 434 (1970) (BURGER, C. J., dissenting).

an independent review by appellate courts of the constitutional fact of obscenity.[19]   That result is required by principles applicable to the obscenity issue no less than to any other area involving free expression, see, *e. g.*, *New York Times Co.* v. *Sullivan*, 376 U. S., at 284–285, or other constitutional right.[20]   In any event, even if the Constitution would permit us to refrain from judging for ourselves the alleged obscenity of particular materials, that approach would solve at best only a small part of our problem.   For while it would mitigate the institutional stress produced by the *Roth* approach, it would neither offer nor produce any cure for the other vices of vagueness.   Far from providing a clearer guide to permissible primary conduct, the approach would inevitably lead to even greater uncertainty and the consequent due process problems of fair notice.   And the approach would expose much protected, sexually oriented expression to the vagaries of jury determinations.   Cf. *Herndon* v. *Lowry*, 301 U. S. 242, 263 (1937).   Plainly, the institutional gain would be more than offset by the unprecedented infringement of First Amendment rights.

4. Finally, I have considered the view, urged so forcefully since 1957 by our Brothers Black and DOUGLAS, that the First Amendment bars the suppression of any sexually oriented expression.   That position would effect a sharp reduction, although perhaps not a total elimination, of the uncertainty that surrounds our current

---

[19] Mr. Justice Harlan, it bears noting, considered this requirement critical for review of not only federal but state convictions, despite his view that the States were accorded more latitude than the Federal Government in defining obscenity. See, *e. g.*, *Roth,* *supra,* at 502–503 (separate opinion).

[20] See generally *Culombe* v. *Connecticut*, 367 U. S. 568, 603–606 (1961) (opinion of Frankfurter, J.) ; cf. *Crowell* v. *Benson*, 285 U. S. 22, 54–65 (1932) ; *Ng Fung Ho* v. *White*, 259 U. S. 276, 284–285 (1922).

approach. Nevertheless, I am convinced that it would achieve that desirable goal only by stripping the States of power to an extent that cannot be justified by the commands of the Constitution, at least so long as there is available an alternative approach that strikes a better balance between the guarantee of free expression and the States' legitimate interests.

## V

Our experience since *Roth* requires us not only to abandon the effort to pick out obscene materials on a case-by-case basis, but also to reconsider a fundamental postulate of *Roth:* that there exists a definable class of sexually oriented expression that may be totally suppressed by the Federal and State Governments. Assuming that such a class of expression does in fact exist,[21] I am forced to conclude that the concept of "obscenity" cannot be defined with sufficient specificity and clarity to provide fair notice to persons who create and distribute sexually oriented materials, to prevent substantial erosion of protected speech as a byproduct of the attempt to suppress unprotected speech, and to avoid very costly institutional harms. Given these inevitable side effects of state efforts to suppress what is assumed to be *unprotected* speech, we must scrutinize with care the state interest that is asserted to justify the suppression. For in the absence of some very substantial interest in suppressing such speech, we can hardly condone the ill effects that seem to flow inevitably from the effort.[22]

---

[21] See n. 9, *supra.*

[22] Cf. *United States* v. *O'Brien,* 391 U. S. 367, 376–377 (1968):

"This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize

Obscenity laws have a long history in this country. Most of the States that had ratified the Constitution by 1792 punished the related crime of blasphemy or profanity despite the guarantees of free expression in their constitutions, and Massachusetts expressly prohibited the "Composing, Writing, Printing or Publishing, of any Filthy Obscene or Prophane Song, Pamphlet, Libel or Mock-Sermon, in Imitation or in Mimicking of Preaching, or any other part of Divine Worship." Acts and Laws of Massachusetts Bay Colony (1726), Acts of 1711–1712, c. 1, p. 218. In 1815 the first reported obscenity conviction was obtained under the common law of Pennsylvania. See *Commonwealth* v. *Sharpless*, 2 S. & R. 91. A conviction in Massachusetts under its common law and colonial statute followed six years later. See *Commonwealth* v. *Holmes,* 17 Mass. 336 (1821). In 1821 Vermont passed the first state law proscribing the publication or sale of "lewd or obscene" material, Laws of Vermont, 1824, c. XXXII, No. 1, § 23, and federal legislation barring the importation of similar matter appeared in 1842. See Tariff Act of 1842, § 28, 5 Stat. 566. Although the number of early obscenity laws was small and their enforcement exceedingly lax, the situation significantly changed after about 1870 when Federal and State Governments, mainly as a result of the efforts

---

the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." (Footnotes omitted.)

See also *Speiser* v. *Randall,* 357 U. S. 513 (1958).

of Anthony Comstock, took an active interest in the suppression of obscenity. By the end of the 19th century at least 30 States had some type of general prohibition on the dissemination of obscene materials, and by the time of our decision in *Roth* no State was without some provision on the subject. The Federal Government meanwhile had enacted no fewer than 20 obscenity laws between 1842 and 1956. See *Roth* v. *United States,* 354 U. S., at 482–483, 485; Report of the Commission on Obscenity and Pornography 300–301 (1970).

This history caused us to conclude in *Roth* "that the unconditional phrasing of the First Amendment [that 'Congress shall make no law . . . abridging the freedom of speech, or of the press . . .'] was not intended to protect every utterance." 354 U. S., at 483. It also caused us to hold, as numerous prior decisions of this Court had assumed, see *id.,* at 481, that obscenity could be denied the protection of the First Amendment and hence suppressed because it is a form of expression "utterly without redeeming social importance," *id.,* at 484, as "mirrored in the universal judgment that [it] should be restrained . . . ." *Id.,* at 485.

Because we assumed—incorrectly, as experience has proved—that obscenity could be separated from other sexually oriented expression without significant costs either to the First Amendment or to the judicial machinery charged with the task of safeguarding First Amendment freedoms, we had no occasion in *Roth* to probe the asserted state interest in curtailing unprotected, sexually oriented speech. Yet, as we have increasingly come to appreciate the vagueness of the concept of obscenity, we have begun to recognize and articulate the state interests at stake. Significantly, in *Redrup* v. *New York,* 386 U. S. 767 (1967), where we set aside findings

of obscenity with regard to three sets of material, we pointed out that

"[i]n none of the cases was there a claim that the statute in question reflected a specific and limited state concern for juveniles. See *Prince* v. *Massachusetts,* 321 U. S. 158; cf. *Butler* v. *Michigan,* 352 U. S. 380. In none was there any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it. Cf. *Breard* v. *Alexandria,* 341 U. S. 622; *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451. And in none was there evidence of the sort of 'pandering' which the Court found significant in *Ginzburg* v. *United States,* 383 U. S. 463." 386 U. S., at 769.

See *Rowan* v. *Post Office Dept.,* 397 U. S. 728 (1970); *Stanley* v. *Georgia,* 394 U. S., at 567.[23]

The opinions in *Redrup* and *Stanley* reflected our emerging view that the state interests in protecting children and in protecting unconsenting adults may stand on a different footing from the other asserted state interests. It may well be, as one commentator has argued, that "exposure to [erotic material] is for some persons an intense emotional experience. A communication of this nature, imposed upon a person contrary to his wishes,

---

[23] See also *Rabe* v. *Washington,* 405 U. S. 313, 317 (1972) (concurring opinion); *United States* v. *Reidel,* 402 U. S. 351, 360–362 (1971) (separate opinion); *Ginsberg* v. *New York,* 390 U. S. 629 (1968); *id.,* at 674–675 (dissenting opinion); *Redmond* v. *United States,* 384 U. S. 264, 265 (1966); *Ginzburg* v. *United States,* 383 U. S. 463 (1966); *id.,* at 498 n. 1 (dissenting opinion); *Memoirs* v. *Massachusetts,* 383 U. S. 413, 421 n. 8 (1966); *Jacobellis* v. *Ohio,* 378 U. S., at 195 (1964) (opinion of BRENNAN, J., joined by Goldberg, J.); *id.,* at 201 (dissenting opinion). See also Report of the Commission on Obscenity and Pornography 300–301 (1970) (focus of early obscenity laws on protection of youth).

has all the characteristics of a physical assault. . . . [And it] constitutes an invasion of his privacy . . . ." [24] But cf. *Cohen* v. *California,* 403 U. S., at 21–22. Similarly, if children are "not possessed of that full capacity for individual choice which is the presupposition of the First Amendment guarantees," *Ginsberg* v. *New York,* 390 U. S., at 649–650 (STEWART, J., concurring), then the State may have a substantial interest in precluding the flow of obscene materials even to consenting juveniles. [25] But cf. *id.,* at 673–674 (Fortas, J., dissenting).

But, whatever the strength of the state interests in protecting juveniles and unconsenting adults from exposure to sexually oriented materials, those interests cannot be asserted in defense of the holding of the Georgia Supreme Court in this case. That court assumed for the purposes of its decision that the films in issue were exhibited only to persons over the age of 21 who viewed them willingly and with prior knowledge of the nature of their contents. And on that assumption the state court held that the films could still be suppressed. The justification for the suppression must be found, therefore, in some independent interest in regulating the reading and viewing habits of consenting adults.

At the outset it should be noted that virtually all of the interests that might be asserted in defense of suppression, laying aside the special interests associated with distribution to juveniles and unconsenting adults, were also posited in *Stanley* v. *Georgia, supra,* where we held that the State could not make the "mere private possession of obscene material a crime." *Id.,* at 568. That decision presages the conclusions I reach here today.

In *Stanley* we pointed out that "[t]here appears to be

---

[24] T. Emerson, The System of Freedom of Expression 496 (1970).
[25] See *ibid.*

little empirical basis for" the assertion that "exposure to obscene materials may lead to deviant sexual behavior or crimes of sexual violence." *Id.*, at 566 and n. 9.[26] In any event, we added that "if the State is only concerned about printed or filmed materials inducing antisocial conduct, we believe that in the context of private consumption of ideas and information we should adhere to the view that '[a]mong free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law . . . .' *Whitney* v. *California*, 274 U. S. 357, 378 (1927) (Brandeis, J., concurring)." *Id.*, at 566–567.

Moreover, in *Stanley* we rejected as "wholly inconsistent with the philosophy of the First Amendment," *id.*, at 566, the notion that there is a legitimate state concern in the "control [of] the moral content of a person's thoughts," *id.*, at 565, and we held that a State "cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts." *Id.*, at 566. That is not to say, of course, that a State must remain utterly indifferent to—and take no action bearing on—the morality of the community. The traditional descrip-

---

[26] Indeed, since *Stanley* was decided, the President's Commission on Obscenity and Pornography has concluded:

"In sum, empirical research designed to clarify the question has found no evidence to date that exposure to explicit sexual materials plays a significant role in the causation of delinquent or criminal behavior among youth or adults. The Commission cannot conclude that exposure to erotic materials is a factor in the causation of sex crime or sex delinquency." Report of the Commission on Obscenity and Pornography 27 (1970) (footnote omitted).

To the contrary, the Commission found that "[o]n the positive side, explicit sexual materials are sought as a source of entertainment and information by substantial numbers of American adults. At times, these materials also appear to serve to increase and facilitate constructive communication about sexual matters within marriage." *Id.*, at 53.

tion of state police power does embrace the regulation of morals as well as the health, safety, and general welfare of the citizenry. See, e. g., *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 395 (1926). And much legislation—compulsory public education laws, civil rights laws, even the abolition of capital punishment—is grounded, at least in part, on a concern with the morality of the community. But the State's interest in regulating morality by suppressing obscenity, while often asserted, remains essentially unfocused and ill defined. And, since the attempt to curtail unprotected speech necessarily spills over into the area of protected speech, the effort to serve this speculative interest through the suppression of obscene material must tread heavily on rights protected by the First Amendment.

In *Roe* v. *Wade*, 410 U. S. 113 (1973), we held constitutionally invalid a state abortion law, even though we were aware of

> "the sensitive and emotional nature of the abortion controversy, of the vigorous opposing views, even among physicians, and of the deep and seemingly absolute convictions that the subject inspires. One's philosophy, one's experiences, one's exposure to the raw edges of human existence, one's religious training, one's attitudes toward life and family and their values, and the moral standards one establishes and seeks to observe, are all likely to influence and to color one's thinking and conclusions about abortion."
> *Id.,* at 116.

Like the proscription of abortions, the effort to suppress obscenity is predicated on unprovable, although strongly held, assumptions about human behavior, morality, sex, and religion.[27] The existence of these assumptions can-

---

[27] See Henkin, Morals and the Constitution: The Sin of Obscenity, 63 Col. L. Rev. 391, 395 (1963).

not validate a statute that substantially undermines the guarantees of the First Amendment, any more than the existence of similar assumptions on the issue of abortion can validate a statute that infringes the constitutionally protected privacy interests of a pregnant woman.

If, as the Court today assumes, "a state legislature may . . . act on the . . . assumption that commerce in obscene books, or public exhibitions focused on obscene conduct, have a tendency to exert a corrupting and debasing impact leading to antisocial behavior," *ante*, at 63, then it is hard to see how state-ordered regimentation of our minds can ever be forestalled. For if a State, in an effort to maintain or create a particular moral tone, may prescribe what its citizens cannot read or cannot see, then it would seem to follow that in pursuit of that same objective a State could decree that its citizens must read certain books or must view certain films. Cf. *United States* v. *Roth,* 237 F. 2d 796, 823 (CA2 1956) (Frank, J., concurring). However laudable its goal—and that is obviously a question on which reasonable minds may differ—the State cannot proceed by means that violate the Constitution. The precise point was established a half century ago in *Meyer* v. *Nebraska,* 262 U. S. 390 (1923).

> "That the State may do much, go very far, indeed, in order to improve the quality of its citizens, physically, mentally and morally, is clear; but the individual has certain fundamental rights which must be respected. The protection of the Constitution extends to all, to those who speak other languages as well as to those born with English on the tongue. Perhaps it would be highly advantageous if all had ready understanding of our ordinary speech, but this cannot be coerced by methods which conflict with the Constitution—a desirable end cannot be promoted by prohibited means.

"For the welfare of his Ideal Commonwealth, Plato suggested a law which should provide: 'That the wives of our guardians are to be common, and their children are to be common, and no parent is to know his own child, nor any child his parent. . . . The proper officers will take the offspring of the good parents to the pen or fold, and there they will deposit them with certain nurses who dwell in a separate quarter; but the offspring of the inferior, or of the better when they chance to be deformed, will be put away in some mysterious, unknown place, as they should be.' In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to official guardians. Although such measures have been deliberately approved by men of great genius, their ideas touching the relation between individual and State were wholly different from those upon which our institutions rest; and it hardly will be affirmed that any legislature could impose such restrictions upon the people of a State without doing violence to both letter and spirit of the Constitution." *Id.*, at 401–402.

Recognizing these principles, we have held that so-called thematic obscenity—obscenity which might persuade the viewer or reader to engage in "obscene" conduct—is not outside the protection of the First Amendment:

"It is contended that the State's action was justified because the motion picture attractively portrays a relationship which is contrary to the moral standards, the religious precepts, and the legal code of its citizenry. This argument misconceives what it is that the Constitution protects. Its guarantee is

not confined to the expression of ideas that are conventional or shared by a majority. It protects advocacy of the opinion that adultery may sometimes be proper, no less than advocacy of socialism or the single tax. And in the realm of ideas it protects expression which is eloquent no less than that which is unconvincing." *Kingsley Pictures Corp.* v. *Regents,* 360 U. S. 684, 688–689 (1959).

Even a legitimate, sharply focused state concern for the morality of the community cannot, in other words, justify an assault on the protections of the First Amendment. Cf. *Griswold* v. *Connecticut,* 381 U. S. 479 (1965); *Eisenstadt* v. *Baird,* 405 U. S. 438 (1972); *Loving* v. *Virginia,* 388 U. S. 1 (1967). Where the state interest in regulation of morality is vague and ill defined, interference with the guarantees of the First Amendment is even more difficult to justify.[28]

In short, while I cannot say that the interests of the State—apart from the question of juveniles and unconsenting adults—are trivial or nonexistent, I am compelled to conclude that these interests cannot justify the substantial damage to constitutional rights and to this Nation's judicial machinery that inevitably results

---

[28] "[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello* v. *Chicago,* 337 U. S. 1 (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Tinker* v. *Des Moines School District,* 393 U. S. 503, 508–509 (1969). See also *Cohen* v. *California,* 403 U. S. 15, 23 (1971).

from state efforts to bar the distribution even of unprotected material to consenting adults. *NAACP* v. *Alabama,* 377 U. S. 288, 307 (1964); *Cantwell* v. *Connecticut,* 310 U. S., at 304. I would hold, therefore, that at least in the absence of distribution to juveniles or obtrusive exposure to unconsenting adults, the First and Fourteenth Amendments prohibit the State and Federal Governments from attempting wholly to suppress sexually oriented materials on the basis of their allegedly "obscene" contents. Nothing in this approach precludes those governments from taking action to serve what may be strong and legitimate interests through regulation of the manner of distribution of sexually oriented material.

## VI

Two Terms ago we noted that

"there is developing sentiment that adults should have complete freedom to produce, deal in, possess and consume whatever communicative materials may appeal to them and that the law's involvement with obscenity should be limited to those situations where children are involved or where it is necessary to prevent imposition on unwilling recipients of whatever age. The concepts involved are said to be so elusive and the laws so inherently unenforceable without extravagant expenditures of time and effort by enforcement officers and the courts that basic reassessment is not only wise but essential." *United States* v. *Reidel,* 402 U. S., at 357.

Nevertheless, we concluded that "the task of restructuring the obscenity laws lies with those who pass, repeal, and amend statutes and ordinances." *Ibid.* But the law of obscenity has been fashioned by this Court—and necessarily so under our duty to enforce the Constitution.

It is surely the duty of this Court, as expounder of the Constitution, to provide a remedy for the present unsatisfactory state of affairs. I do not pretend to have found a complete and infallible answer to what Mr. Justice Harlan called "the intractable obscenity problem." *Interstate Circuit, Inc.* v. *Dallas,* 390 U. S., at 704 (separate opinion). See also *Memoirs* v. *Massachusetts,* 383 U. S., at 456 (dissenting opinion). Difficult questions must still be faced, notably in the areas of distribution to juveniles and offensive exposure to unconsenting adults. Whatever the extent of state power to regulate in those areas,[29] it should be clear that the view I espouse today would introduce a large measure of clarity to this troubled area, would reduce the institutional pressure on this Court and the rest of the State and Federal Judiciary, and would guarantee fuller freedom of expression while leaving room for the protection of legitimate governmental interests. Since the Supreme Court of Georgia erroneously concluded that the State has power to suppress sexually oriented material even in the absence of distribution to juveniles or exposure to unconsenting adults, I would reverse that judgment and remand the case to that court for further proceedings not inconsistent with this opinion.

---

[29] The Court erroneously states, *Miller* v. *California, ante,* at 27, that the author of this opinion "indicates that suppression of unprotected obscene material is permissible to avoid exposure to unconsenting adults . . . and to juveniles . . . ." I defer expression of my views as to the scope of state power in these areas until cases squarely presenting these questions are before the Court. See n. 9, *supra; Miller* v. *California, supra* (dissenting opinion).