GROSSER ET AL. *v.* WOOLLETT ET AL.

(No. 932,547—Decided September 20, 1974.)

Court of Common Pleas, Cuyahoga County.

*Messrs. Cain & Lobo*, for plaintiff.
*Messrs. Squire, Sanders & Dempsey* and *Mr. Eben Crawford*, for defendant.

McMonagle, J. This is an action filed by Robert W. Grosser, John W. McCracken, Freddie L. Wells, A. L. Bingham and David R. Schaeffer, as citizens and taxpayers of the Strongsville City School District, together with Sally Grosser, a juvenile; Jeffrey McCracken, a juvenile; Dreama Wells, a juvenile; and Michael Bingham, a juvenile, who are children of the first four aforenamed plaintiffs and which children are students of the Strongsville High School except the plaintiff, Jeffrey McCracken, who is a student at Central Junior High School.

The defendants are Richard Woollett, the President of the Strongsville Board of Education; Walter Ehrnfelt, Jr., David Elmer, Kenneth Ramsey, and Ellen J. Wong, members of the Board of Education; together with Dr. Edwin W. Boy, Superintendent of the Stronsgville City School District; Raymond J. Kestner, the Assistant Superintendent of the Strongsville City School District; Joseph Carter, Principal of Strongsville High School; and Carol Petersen, the Head of the English Department of the Strongsville High School.

Plaintiffs are asking the court to issue a permanent injunction restraining and enjoining the defendants, and each of them, from using or assigning the books "Manchild in the Promised Land" by Claude Brown and "One Flew Over the Cuckoo's Nest" by Ken Kesey, as part of the curriculum of the high school.

The book by Claude Brown is referred to herein as "Manchild" and the book by Ken Kesey is referred to as "Cuckoo."

The "Manchild" book consists of 429 pages and is Exhibit 1 herein. The "Cuckoo" book consists of 272 pages and is Exhibit 2 herein. The Court has read each of these books. "Manchild" is the autobiography of a black who tells of his childhood and adolescence in Harlem including descriptions of his participation in and also abandonment of crime and drug action. It also narrates his abandonment of the environment into which he was born and his completion of his high school and college education and entry into law school.

The cover of "Cuckoo" fairly describes it as a story of a lusty, profane, life-loving fighter who rallies the other patients in an insane asylum around him by challenging the dictatorship of Big Nurse. The book is written in the first person by an inmate of the asylum, an Indian who simulates being deaf and dumb.

Words which are usually considered to be foul or dirty words are frequently used in the books. Incidents not normally the subject of conversation either in the home or in public gatherings are described. It was the testimony at the trial that when the books were discussed by the parties at public meetings that the speakers refrained from verbatim readings of words and passages. All witnesses at the trial were hesitant to use specific words that are contained in each of the books and testified that neither they, nor their families, did use them in the home. It was also the testimony at the trial that the books could be used in the classrooms and the meaning or import of the words described without actually using the words themselves.

It is certain that many words and phrases used im-

pelled the plaintiffs to bring this action. It is also certain that the plaintiffs are probably not aware of the full contents of the records of the decisions of the Supreme Court of the United States that have, to a large extent, made it possible for the current literature, magazines, etc., to include much matter that had previously been outlawed.

The use of words and the descriptions of occurrences that a very few years ago were objectionable and shocking, at times even unlawful, now are commonplace and some are definitely not even taboo. These include "damn" and "hell." Many which are now frequently used in print, on the television, on the stage and in the movies are still taboo for ordinary conversation.

The word "shit" is described by the witness, Petersen, as an epithet or expletive and is not a pejorative.

The following is from the transcript of the testimony of Carol G. Petersen at page 43:

"A. I don't believe that it is pejorative. I think it's an epithet that is filled in in place of a word that either somebody can't think or doesn't have a replacement for.

"Q. There's no other words that could take the place of that word in education?

"A. In the intent behind what this character is feeling at the time and in his circumstances, no. This is his level.

"Q. That does refer to human elimination functions, doesn't it?

"A. It doesn't have to.

"Q. I asked you if it does.

"A. No.

"Q. What does it refer to?

"A. It refers to a word that fills in for what he doesn't have, you know, another word.

"He wouldn't say feces, because it's not a word in his vocabulary.

"It doesn't mean feces; what it really means is junk, red tape, you know, all the stuff that you have to go through to get anywhere, is what he means.

"Q. Then this word doesn't mean what it says?

"A. Basically that's true when you talk about some of these epithets."

Simply because many words contained in the books are in the dictionary and also used by some individuals does not make them less offensive to the current prevailing standards in the local adult community.

Plaintiffs contend that each of the said books is harmful to juveniles, obscene, demeaning, pornographic, offensive and depraved; that each book tends to appeal to the prurient interest of juveniles; contains a display, description, or representation of sexual activity, masturbation, sexual excitment, or nudity; contains a display, description, or representation of bestiality or extreme or bizarre violence, cruelty, or brutality; contains a display, description, or representation of human bodily functions of elimination; makes repeated use of foul language; contains lurid detail of violent physical torture, and the description of criminal activity which tends to glorify or glamorize such activity and with respect to juveniles has a dominant tendency to corrupt.

Defendants deny that the use of said books is harmful to juveniles and that their contents are such as to have a dominant tendency to corrupt juveniles.

The use of said books has been recommended by the head of the English Department who will teach the subject courses, the Superintendent of the Schools, the Assistant Superintendent and the high school principal.

A Citizen's Textbook Committee has been established by the Strongsville Board of Education to review books suggested for use in the schools. The Committee consists of sixteen members; one citizen appointed by each of the five school board members and the presidents of the PTA Associations in the school district. The vote of the Committee on "Manchild" was five no objection, six objection. The vote on "Cuckoo" was six no objection, three objection and one abstention.

There were two public hearings by the School Board and necessary copies of the books have been ordered. The "Manchild" book is to be used in a course on "Street Literature" and the "Cuckoo" book to be used in the course on "Realism, Naturalism and Determinism." The defendant, Mrs. Carol Petersen, is the head of the English Depart-

ment of the Strongsville High School and she is the teacher of the courses captioned.

The court has decided that the judgment in this case is dependent upon the court's finding as to whether the use of the books "Manchild" and "Cuckoo" by the defendants in their teaching of juvenile high school students constitutes a violation of the statutes of Ohio, specifically R. C. 2907.31, "Disseminating Matter Harmful to Juveniles," in accordance with the definitions contained in R. C. 2907.01 and should be enjoined. These Ohio statutes were adopted in an effort by the Ohio Legislature to establish standards of conduct with respect to what is permissible as well as what is prohibited in accordance with mandates contained in current decisions of the United States Supreme Court.

Although this court has common law jurisdiction to abate any activities that create a nuisance, the exercise of its equitable powers must follow the general applicable law. Where the statutes establish valid standards or prohibits certain actions, the court should not attempt to legislate with respect to such matters by substituting that which he feels should be prohibited for that which is prohibited in valid legislative criminal enactments.

In deciding this case the court will apply the standard set by the legislature.

The basic issue stated by the court at the time of the commencement of the trial was the following:

"Did the action of the defendant school board and the other defendants in directing use of these books constitute a gross misuse of discretion?"

There can be no question about the authority of the school board to determine what books should be used as part of the teaching of students.

R. C. 3329.07 provides in part as follows:

"The board of education of each city, exempted village, and local school district, shall cause it to be ascertained and at a regular meeting determine which, and the number of each of the textbooks the schools under its charge require. . . ."

This section of the code was recently interpreted by

Judge Robert Krupansky in *Minarcini* v. *Strongsville City School District*, U. S. D. C., N. D. Ohio, E. D., Civil Action No. C 72-1222, at page 18 of his opinion:

"Chapter 3329 of the Ohio Revised Code, more particularly §3329.07, mandates the Board of Education of each City School District to ascertain and determine at regularly scheduled meetings which, and the number of each of the textbooks the schools under its charge require."

If, as a matter of law, that the furnishing of either of these books constitutes a violation of the Ohio statutes, there is no discretion to be exercised by a defendant. Neither the school board nor any person would have any discretion to exercise. No one could, under the guise of contending it was exercising some discretion, commit or authorize the commission of an illegal act.

It is the law that a court may enjoin acts constituting a public nuisance even though the acts enjoined constitute a violation of the Revised Code.

It is the claim of the plaintiffs that the contemplated acts of the defendants would violate public rights or welfare and should be enjoined.

This court does have the power to do so if warranted by the facts. In *State, ex rel. Chalfin,* v. *Glick* (1961), 172 Ohio St. 249 at page 254, the Ohio Supreme Court stated:

"The rule in Ohio, as well as the general rule, is stated in 43 Corpus Juris Secundum, 764, Section 152, as follows:

" 'Injunction will issue to protect public rights, property, or welfare notwithstanding the acts enjoined may also constitute crimes.

" 'Where an injunction is necessary for the protection of public rights, property or welfare, the criminality of the acts complained of does not bar the remedy by injunction, and the court will consider the criminality of the act only to determine whether under the particular circumstances, equitable intervention is necessary. Such an injunction ought not to be granted, however, except for the prevention of serious and irreparable injury, and cannot be demanded as a matter of right, but rests in the sound discretion of the court.' "

Because of the controversy that arose with reference to the use of these books, the school board decided that a student who had elected to take one or the other of the courses in which the books were used would not be permitted to do so without the written consent of his parents. Apparently, two hundred twenty nine students had elected to take the course in "Street Literature" in which the "Manchild" book would be used. Notices were sent to the parents of each of these. One Hundred Nineteen replied. Eighty seven consented and thirty two did not consent. Thirty notices were sent out with reference to "Cuckoo." Fifteen replied. Of these, thirteen consented and two did not consent.

State statutes contained in R. C. 2907.01, et seq. were enacted in an effort to conform with rules contained in decisions by the Supreme Court of the United States in obscenity cases.

The concurring opinion of Justice Brennan in *Jenkins* v. *Georgia* (1974), 94 S. Ct. 2750, contains concise statements of the current law and many guidelines for legislatures and courts.

*Jenkins* v. *Georgia, supra*:

Syllabus 4—Obscenity

"Jury in state obscenity prosecution could be instructed to apply 'community standards' without specification as to what 'community' was referred to."

Syllabus 5—Obscenity

"State may choose to define obscenity offense in terms of 'contemporary community standards' without further specification or may choose to define standards in more precise geographic terms."

Syllabus 8—Obscenity

"Although questions of appeal to prurient interest or of patent offensiveness are essentially questions of fact in state obscenity prosecutions, juries do not have unbridled discretion in determining what is patently offensive."

Syllabus 9—Obscenity

"Nudity alone is not enough to make material legally

obscene under currently operative constitutional standards."

The current general rule with reference to the dissemination of obscene material is that stated by Chief Justice Burger in *Miller* v. *California* (1973), 413 U. S. 15, Syllabus 2:

"The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, *Kois* v. *Wisconsin, supra,* at 230, quoting *Roth* v. *United States, supra,* at 489; (b) whether the work depicts or describes in a patently offensive way, *sexual conduct specifically defined by the applicable state law;* and (c) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value. * * *"

In *Jenkins* v. *Georgia* (1974), 94 S. Ct. 2750, Mr. Justice Rehnquist delivered the opinion of the Court as follows:

"The jury that found appellant guilty was instructed on obscenity pursuant to the Georgia statute, which defines obscene material in language similar to that of the definition of obscenity set forth in this Court's plurality opinion in *Memoirs* v. *Massachusetts*, 383 U. S. 413, 418, 86 S. Ct. 975, 977, 16 L. Ed. 2d 1 (1966):

"'Material is obscene if considered as a whole applying community standards, its predominant appeal is to prurient interest, that is, a shameful or morbid interest in nudity, sex or excretion, and utterly without redeeming social value and if, in addition, it goes substantially beyond customary limits of candor in describing or representing such matters.' Ga. Code. Ann. §26-2101(b) (1972)." (page 2752)

"* * * *Miller* held that it was constitutionally permissible to permit juries to rely on the understanding of the community from which they came as to contemporary community standards, and the States have considerable latitude in framing statutes under this element of the Miller decision. A State may choose to define an obscenity offense in

terms of 'contemporary community standards' as defined in Miller without further specification, as was done here, or it may choose to define the standards in more precise geographic terms, as was done by California in *Miller*." (page 2753.)

"* * * We held in *Paris Adult Theatre 1* v. *Slaton*, 413 U. S. 49, 93 S. Ct. 2628, 37 L. Ed. 2d 446 (1973), decided on the same day, that expert testimony as to obscenity is not necessary when the films at issue are themselves placed in evidence. Id., at 56, 93 S. Ct. at 2634" (page 2754)

The concurring opinion of Justice Brennan in *Jenkins* v. *Georgia* (1974), 94 S. Ct. 2750, states most of the guidelines for state courts and legislatures:

"Adopting a restatement of the *Roth-Memoirs* definition of 'obscenity,' the Court in *Miller* v. *California*, 413 U. S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973) held that obscene material could be regulated, provided that '(a) . . . "the average person, applying contemporary community standards" would find that the work, taken as a whole appeals to the prurient interest. . . . (b) . . . the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) . . . the work, taken as a whole, lacks serious literary, artistic, political or scientific value.' *Miller* v. *California, supra*, 413 U. S., at 24, 93 S. Ct., at 2615. It was my view then—and it remains so—that the Court's reformulation hardly represented a solution to what Mr. Justice Harlan called 'the intractable obscenity problem.' *Interstate Circuit, Inc.*, v. *Dallas*, 390 U. S. 676, 704, 88 S. Ct. 1298, 1313, 20 L. Ed. 2d 225 (1968) (concurring and dissenting). Today's decision confirms my observation in *Paris Adult Theatre 1* v. *Slaton*, 413 U. S. 49, 93 S. Ct. 2628, 37 L. Ed. 2d 446 (1973) that the Court's new formulation does not extricate us from the mire of case-by-case determinations of obscenity.' I there noted that:

'Ultimately, the reformation must fail because it still leaves in this Court the responsibility of determining in each case whether the materials are protected by the First Amendment. The Court concedes that even under its restated formulation, the First Amendment interests at stake

require 'appellate courts to conduct an independent review of constitutional claims when necessary,' *Miller* v. *California* [413 U. S. 15, 25, 93 S. Ct. 2607, 37 L. Ed. 2d 419], citing Mr. Justice Harlan's opinion in *Roth*, where he stated, 'I do not understand how the Court can resolve the constitutional problems now before it without making its own independent judgment upon the character of the material upon which these convictions were based.' 354 U. S., at 498, 77 S. Ct., at 1316. Thus, the Court's new formulation will not relieve us of 'the awesome task of making case by case at once the criminal and the constitutional law.' And the careful efforts of state and lower federal courts to apply the standard will remain an essentially pointless exercise, in view of the need for an ultimate decision by this Court. In addition, since the status of sexually oriented material will necessarily remain in doubt until final decision by this Court, the new approach will not diminish the chill on protected expression that derives from the uncertainty of the underlying standard. I am convinced that a definition of obscenity in terms of physical conduct cannot provide sufficient clarity to afford fair notice, to avoid a chill on protected expression, and to minimize the institutional stress, so long as that definition is used to justify the outright suppression of any material that is asserted to fall within its terms.'

"Thus, it is clear that as long as the *Miller* test remains in effect 'one cannot say with certainty that material is obscene until at least five members of this Court, applying inevitably obscure standards, have pronounced it so.' *Paris Adult Theatre 1* v. *Slaton, supra,* 413 U. S., at 92, 93 S. Ct., at 2652 (Brennan, J., dissenting). Because of the attendant uncertainty of such a process and its inevitable institutional stress upon the judiciary, I continue to adhere to my view that, 'at least in the absence of distribution to juveniles or obtrusive exposure to unconsenting adults, the First and Fourteenth Amendments prohibit the State and Federal Governments from attempting wholly to suppress sexually oriented materials on the basis of their allegedly 'obscene contents'.''

It is apparent from the Supreme Court decisions that

members of a jury or a court may measure the essentially factual issues as to what is patently offensive in obscenity matters by his knowledge of the standards prevailing in the community. These determinations may be made from the material itself.

The court has indicated that it feels that standards as contained in the Ohio Revised Code should be applied in deciding the within action.

R. C. 2907.01:

(E) Any material or performance is "harmful to juveniles," if it is offensive to prevailing standards in the adult community with respect to what is suitable for juveniles and if any of the following apply:

(1) It tends to appeal to the prurient interest of juveniles;

(2) It contains a display, description, or representation of sexual activity, masturbation, sexual excitement, or nudity;

(3) It contains a display, description, or representation of bestiality or extreme or bizzare violence, cruelty, or brutality;

(4) It contains a display, description, or representation of human bodily functions of elimination;

(5) It makes repeated use of foul language;

(6) It contains a display, description, or representation in lurid detail of the violent physical torture, dismemberment, destruction, or death of a human being;

(7) It contains a display, description, or representation of criminal activity which tends to glorify or glamorize such activity, and which with respect to juveniles has a dominant tendency to corrupt.

(I) "Juvenile" means an unmarried person under the age of eighteen.

(J) "Material" means any book, magazine, newspaper, pamphlet, poster, print, picture, figure, image, description, motion picture film, phonographic record or tape, or other tangible thing capable of arousing interest through sight, sound, or touch.

R. C. 2907.31 Disseminating matter harmful to juveniles.

(A) "No person, with knowledge of its character, shall recklessly furnish or present to a juvenile any material or performance which is obscene or harmful to juveniles."

R. C. 2901.22 (C) states: "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."

(B) "The following are affirmative defenses to a charge under this section, involving material or a performance which is harmful to juveniles but not obscene:

"(a) The juvenile involved, at the time the material or performance was presented to him was accompanied by his parent or guardian who, with knowledge of its character, consented to the material or performance being furnished or presented to the juvenile."

(C) "It is an affirmative defense to a charge under this section, involving material or a performance which is obscene or harmful to juveniles, that such material or performance was furnished or presented for a bona fide medical, scientific, educational, governmental, judicial, or other proper purpose, by a physician, psychologist, sociologist, scientist, teacher, librarian, clergyman, prosecutor, judge, or other proper person."

The court considers that a determination of the following issues is required herein:

Is R. C. 2907 in accordance with current standards established by the Supreme Court of the United States?

The Supreme Court held in *Roth* v. *United States*, 354 U. S. 476, Syllabus 3:

"Obscenity is not within the area of constitutionally protected freedom of speech of press—either (1) under the First Amendment, as to the Federal Government, or (2) under the Due Process Clause of the Fourteenth Amendment, as to the States, Pp. 481-485."

The court holds that the provisions of R. C. 2907.31, effective January 1, 1974, including definitions contained

in R. C. 2907.01 are constitutional and in accordance with the current standards stated by the United States Supreme Court.

The issue the court is to decide may be stated as follows:

Are the books "Manchild" and "Cuckoo" or either of them harmful to juveniles when considered in accordance with the standards contained in the cited provisions of the Ohio Revised Code?

This is not to say that the use of these books—disregarding at this point the affirmative defenses specified in the Code—would constitute a criminal offense. The following are the criteria used by the court in deciding this action:

(1) Is the material offensive to prevailing standards in the adult community with respect to what is suitable for juveniles and

(2) It tends to appeal to the prurient interest of juveniles;

(3) It contains a description and representation of sexual activity, masturbation, or sexual excitement;

(4) It contains a description of bestiality or extreme or bizzare violence, cruelty, or brutality;

(5) It contains a description of human bodily functions of elimination;

(6) It makes repeated use of foul language;

(7) It contains a description in lurid detail of violent physical torture or death of a human being.

(8) It contains a description of criminal activity which tends to glorify or glamorize such activity, and which with respect to juveniles has a dominant tendency to corrupt.

Following are other definitions which are applicable to the facts in this case:

*The American Heritage Dictionary of the English Language*

foul language—that which is vulgar, obscene and profane.

obscene—offensive to accepted standards of decency or modesty. Inciting lustful feelings; indecent; lewd,

Offensive or repulsive to the senses; loathsome.

profane—showing contempt or irreverence toward God or sacred things; blasphemous. Nonreligious in subject matter, form, or use. Vulgar, coarse.

prurient—obsessively interested in improper matters, especially of a sexual nature. Arousing or appealing to such an interest. To itch, yearn for, be lascivious.

vulgar—Of or associated with the great masses of people as distinguished from the educated or cultivated classes; common. Deficient in taste, delicacy, or refinement. Illbred; boorish; crude. Obscene or indecent; offensive; coarse, or bawdy.

Words in the English language may be considered as in a "gray" area; that is, a word or phrase may have a different meaning to different persons as distinguished from words in the Latin, German or Greek language. However, there can be no question but that the average person applying contemporary community standards would find that these books, taken as a whole, appeal to the prurient interest of minors; they depict or describe in a patently offensive way sexual conduct specifically defined by the applicable state law and the words and language which are repeatedly used in these books can only be described as foul language.

The state statutes with reference to dissemination of material as it pertains to juveniles differs from that pertaining to adults.

The Supreme Court of the United States has repeatedly stated that it recognizes the high importance of the state interest in regulating the exposure of obscene matters to juveniles. See *Miller* v. *California, supra*; *Stanley* v. *Georgia, supra* at 569; *Redrup* v. *New York*, 386 U. S. 767, 769.

Within the past few years the attitude of the people generally has changed with reference to books, literature, the use of words and the description of incidents therein that were previously taboo. Such changes may well continue in the same pattern in the future. It may possibly

be that ultimately legislative bodies or the Supreme Court of the United States will determine that all persons, juveniles and adults, may legally be exposed to what are now illegal books and writings and the description or narration of heretofore taboo actions such as is not now the status of Ohio laws the decisions of the courts or current attitudes of the members of the local communities.

The statutes that have been frequently referred to herein are presently the law of Ohio. It is the function of the court to uphold and where necessary interpet such laws. It is not the function of the Court to change the laws. It may very well be that hundreds of years from now the names of the authors of these two books and their works will have obtained the status now enjoyed by the classics of Shakespere and Aristotle and approved for all uses. These books, considered as a whole, however, are at this time by contemporary community standards patently offensive.

While a court in determining issues as presented herein will ordinarily decide whether a work, taken as a whole, lacks serious literary, artistic, political or scientific value, such determination need not necessarily be made in identical context where juveniles are involved.

The book "Manchild" (Joint Exhibit 4) to be used in the course on "Street Literature" was selected by Mrs. Petersen particularly to give insight into the ethnic background of black, white and Indian people growing up. The book "Cuckoo" (Joint Exhibit 5) is to be given in the course in "Realism, Naturalism and Determinism" and it was selected by Mrs. Petersen as illustrative of an author's depiction of man in his natural state when influenced by his environment and its forces upon his own internal makeup. The goals and the purposes of these courses are commendable.

The portrayal as made by the authors themselves were never intended or designed for use as textbooks. They have no literary, artistic, political or scientific value whatsoever. They undoubtedly make interesting reading for many persons. The contents of the books were designed by the authors to appeal to the base instincts of persons and

to shock others for the purpose of effectuating sales of the books. It is perfectly obvious that material described in items 2, 3, 4, 5, 6, 7, and 8 of the criteria above mentioned by the Court is present in each of these books.

The court is also required, Item No. 1, to determine whether the material is offensive to prevailing standards in the adult community with respect to what is suitable for juveniles. It is difficult to think of any material, except the hardest of hard-core pornography that the legislature intended to outlaw if not such as the subject books. The court does find that each of these books is offensive to prevailing standards in the adult community with respect to what is suitable for juveniles.

The court further finds that the said books are harmful to juveniles and their use as to juveniles should be enjoined but that consideration should be given to provision R. C. 2907.31 B(2) in which affirmative defenses are specified. It obviously was the intention of the state legislature to place the primary responsibility for what juveniles should see or read on their parents. The court feels that this theory should be applied in the within case. The said statute specifies in substance that obscene material may be presented to a juvenile if accompanied by his parent or guardian with knowledge of the character of the material or performance. The court does not interpret this section as literally as it is stated. The court finds that the written consent of a parent to the use in school of otherwise objectionable material is within what may be determined as an exception contemplated in R. C. 2907.31 B(2). If consent is once given it is not necessary that parents be present at all times the book is used.

The defendants contend that R. C. 2907.31(C) should apply in the within case. This section was included in the code in order that no persons could disseminate material or put on a performance which is obscene or harmful to juveniles under the guise of intending that it was for an educational, scientific, etc. purpose. It is not to be considered that this section of the code gives unlimited approval to elementary or high school teachers or officials to

use, irrespective of the law, any material as they decide.

In the within action it is obvious from this Opinion that the restriction mentioned above apply only to juveniles; that is, only to those seventeen years of age and under. The court is aware of the fact that the defendants have instituted a voluntary restriction as to which students may or may not use these books. The court finds that an exception in accordance with R. C. 2907.31 should be carried into the order of this case.

A permanent injunction will issue enjoining the defendants and each of them from using or assigning "Manchild in the Promised Land" and "One Flew Over the Cuckoo's Nest" as part of the curriculum of the high school for use by juveniles except where a parent or guardian of a child has knowledge of the character of the books and consents to their use. The court does not agree that all use of these books should be enjoined because peer pressure on those not otherwise permitted to use the books would result in harm to them.

A judgment entry in accordance with this Memorandum of Opinion is being concurrently herewith filed.

While the prayer of the complaint asks the court to assess the attorneys' fees of the plaintiffs against defendants, the granting of such request would not be in accordance with the law and is refused.

*Judgment accordingly.*